Argued and submitted March 6, 2009, at University of Oregon School of Law,
Eugene, decision of Court of Appeals and revised order on reconsideration of
Commissioner of Bureau of Labor and Industries reversed April 15, 2010

## EMERALD STEEL FABRICATORS, INC.,
*Petitioner on Review,*

*v.*

## BUREAU OF LABOR AND INDUSTRIES,
*Respondent on Review.*

(BOLI 3004; CA A130422; SC S056265)

230 P3d 518

Terence J. Hammons, of Hammons & Mills, Eugene, argued the cause and filed the brief for petitioner on review.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.

Paula A. Barran, of Barran Liebman LLP, Portland, filed the brief for *amicus curiae* Associated Oregon Industries.

James N. Westwood, of Stoel Rives LLP, Portland, filed the brief for *amici curiae* Pacific Legal Foundation and National Federation of Independent Business. With him on the brief was Deborah J. La Fetra.

KISTLER, J.

**KISTLER, J.**

The Oregon Medical Marijuana Act authorizes persons holding a registry identification card to use marijuana for medical purposes. ORS 475.306(1). It also exempts those persons from state criminal liability for manufacturing, delivering, and possessing marijuana, provided that certain conditions are met. ORS 475.309(1). The Federal Controlled Substances Act, 21 USC § 801 *et seq.*, prohibits the manufacture, distribution, dispensation, and possession of marijuana even when state law authorizes its use to treat medical conditions. *Gonzales v. Raich*, 545 US 1, 29, 125 S Ct 2195, 162 L Ed 2d 1 (2005); *see United States v. Oakland Cannabis Buyers' Cooperative*, 532 US 483, 486, 121 S Ct 1711, 149 L Ed 2d 722 (2001) (holding that there is no medical necessity exception to the federal prohibition against manufacturing and distributing marijuana).

The question that this case poses is how those state and federal laws intersect in the context of an employment discrimination claim; specifically, employer argues that, because marijuana possession is unlawful under federal law, even when used for medical purposes, state law does not require an employer to accommodate an employee's use of marijuana to treat a disabling medical condition. The Court of Appeals declined to reach that question, reasoning that employer had not preserved it. *Emerald Steel Fabricators, Inc. v. BOLI*, 220 Or App 423, 186 P3d 300 (2008). We allowed employer's petition for review and hold initially that employer preserved the question that it sought to raise in the Court of Appeals. We also hold that, under Oregon's employment discrimination laws, employer was not required to accommodate employee's use of medical marijuana. Accordingly, we reverse the Court of Appeals decision.

Since 1992, employee has experienced anxiety, panic attacks, nausea, vomiting, and severe stomach cramps, all of which have substantially limited his ability to eat. Between January 1996 and November 2001, employee used a variety of prescription drugs in an attempt to alleviate that condition. None of those drugs proved effective for an extended period of time, and some had negative effects. In 1996,

employee began using marijuana to self-medicate his condition.

In April 2002, employee consulted with a physician for the purpose of obtaining a registry identification card under the Oregon Medical Marijuana Act. The physician signed a statement that employee has a "debilitating medical condition" and that "[m]arijuana may mitigate the symptoms or effects of this patient's condition." The statement added, however, "This is not a prescription for the use of medical marijuana." The statement that employee's physician signed tracks the terms of the Oregon Medical Marijuana Act. That act directs the state to issue registry identification cards to persons when a physician states that "the person has been diagnosed with a debilitating medical condition and that the medical use of marijuana may mitigate the symptoms or effects" of that condition. ORS 475.309(2).[1] No prescription is required as a prerequisite for obtaining a registry identification card. *See id.*

Based on the physician's statement, employee obtained a registry identification card in June 2002, which he renewed in 2003.[2] That card authorized employee to "engage in * * * the medical use of marijuana" subject to certain restrictions. ORS 475.306(1). Possession of the card also exempted him from state criminal prosecution for the possession, distribution, and manufacture of marijuana, provided that he met certain conditions. ORS 475.309(1).

Employer manufactures steel products. In January 2003, employer hired employee on a temporary basis as a drill press operator. While working for employer, employee used medical marijuana one to three times per day, although not at work. Employee's work was satisfactory, and employer was considering hiring him on a permanent basis. Knowing

---

[1] The 2001 version of the applicable statutes was in effect at the time of the events that gave rise to this proceeding. Since 2001, the legislature has amended those statutes but not in ways that affect our decision, and we have cited to the 2009 version of the statutes.

[2] ORS 475.309(7)(a)(C) requires a person possessing a registry identification card to submit annually "[u]pdated written documentation from the cardholder's attending physician of the person's debilitating medical condition and that the medical use of marijuana may mitigate the symptoms or effects" of that condition. If the person fails to do so, the card "shall be deemed expired." ORS 475.309(7)(b).

that he would have to pass a drug test as a condition of permanent employment, employee told his supervisor that he had a registry identification card and that he used marijuana for a medical problem; he also showed his supervisor documentation from his physician. In response to a question from his supervisor, employee said that he had tried other medications but that marijuana was the most effective way to treat his condition. Neither employee's supervisor nor anyone else in management engaged in any other discussion with employee regarding alternative treatments for his condition. One week later, the supervisor discharged employee.

Two months later, employee filed a complaint with the Bureau of Labor and Industries (BOLI), alleging that employer had discriminated against him in violation of ORS 659A.112. That statute prohibits discrimination against an otherwise qualified person because of a disability and requires, among other things, that employers "make reasonable accommodation" for a person's disability unless doing so would impose an undue hardship on the employer. ORS 659A.112(2)(e). Having investigated employee's complaint, BOLI filed formal charges against employer, alleging that employer had discharged employee because of his disability in violation of ORS 659A.112(2)(c) and (g) and that employer had failed to reasonably accommodate employee's disability in violation of ORS 659A.112(2)(e) and (f). Employer filed an answer and raised seven affirmative defenses.

After hearing the parties' evidence, an administrative law judge (ALJ) issued a proposed order in which he found that employee was a disabled person within the meaning of ORS chapter 659A but that employer had not discharged employee because of his disability. The ALJ found instead that employer had discharged employee because he used marijuana and ruled that discharging employee for that reason did not violate ORS 659A.112(2)(c) or (g). The ALJ went on to rule, however, that employer had violated ORS 659A.112(2)(e) and (f), which prohibit an employer from failing to reasonably accommodate the "known physical or mental limitations of an otherwise qualified disabled person," and from denying employment opportunities to an otherwise

qualified disabled person when the denial is based on the failure "to make reasonable accommodation to the physical or mental impairments of the employee."

Among other things, the ALJ ruled that employer's failure to engage in a "meaningful interactive process" with employee, standing alone, violated the obligation set out in ORS 659A.112(2)(e) and (f) to reasonably accommodate employee's disability. The ALJ also found that employee had suffered damages as a result of those violations, and the commissioner of BOLI issued a final order that adopted the ALJ's findings in that regard.

■ Employer sought review of the commissioner's order in the Court of Appeals. As we understand employer's argument in the Court of Appeals, it ran as follows: Oregon law requires that ORS 659A.112 be interpreted consistently with the federal Americans with Disabilities Act (ADA), 42 USC § 12111 *et seq*. Section 12114(a) of the ADA provides that the protections of the ADA do not apply to persons who are currently engaged in the illegal use of drugs, and the federal Controlled Substances Act prohibits the possession of marijuana without regard to whether it is used for medicinal purposes. It follows, employer reasoned, that the ADA does not apply to persons who are currently engaged in the use of medical marijuana. Like the ADA, ORS 659A.124 provides that the protections of ORS 659A.112 do not apply to persons who are currently engaged in the illegal use of drugs. Employer reasoned that, if ORS 659A.112 is interpreted consistently with the ADA, then ORS 659A.112 also does not apply to persons who are currently engaged in medical marijuana use. Employer added that, in any event, the United States Supreme Court's opinion in *Raich* and the Supremacy Clause required that interpretation.

The Court of Appeals did not reach the merits of employer's argument. It concluded that employer had not presented that argument to the agency and thus had not preserved it. Accordingly, we begin with the question whether employer preserved the issues before BOLI that it sought to raise in the Court of Appeals.

Employer raised seven affirmative defenses in response to BOLI's complaint. The fifth affirmative defense alleged:

"Oregon law prescribes that ORS 659A.112 be construed to the extent possible in a manner that is consistent with any similar provisions of the Federal Americans with Disabilities Act of 1990, as amended. That Act does not permit the use of marijuana because marijuana is an illegal drug under Federal Law."

That affirmative defense is broad enough to encompass the argument that employer made in the Court of Appeals. To be sure, employer's fifth affirmative defense does not refer specifically to ORS 659A.124. However, it alleges that the ADA does not apply to persons who use marijuana, a proposition that necessarily depends on both 42 USC § 12114(a), the federal counterpart to ORS 659A.124, and the Controlled Substances Act. And the fifth affirmative defense also states that ORS 659A.112 should be construed in the same manner as the ADA. Although employer could have been more specific, its fifth affirmative defense is sufficient to raise the statutory issue that it sought to argue in the Court of Appeals.[3]

Ordinarily, we would expect that employer would have developed the legal arguments in support of its fifth affirmative defense more fully at the agency hearing. However, the Court of Appeals issued its decision in *Washburn v. Columbia Forest Products, Inc.*, 197 Or App 104, 104 P3d 609 (2005), two weeks before the hearing in this case, and employer concluded that the reasoning in *Washburn* foreclosed its fifth affirmative defense. The Court of Appeals held in *Washburn* that an employer's failure to accommodate an employee's use of medical marijuana violated ORS 659A.112. In reaching that holding, the Court of Appeals decided two propositions that bore on the validity of employer's fifth affirmative defense. First, it reasoned that the requirement in ORS 659A.139 to interpret ORS 659A.112 consistently with the ADA does not require absolute symmetry between state and federal law. *Id.* at 109-10. Second, it held that, as a matter of state law, the employee's medical use of marijuana was "not unlawful" for the purposes of a federal statute that prohibits the use of illegal drugs in the workplace. *Id.* at 114-15. The court noted that the question "[w]hether medical use of marijuana is unlawful under federal law is an open question"

---

[3] BOLI points to nothing in its rules that suggests that more specificity was required. *Cf.* OAR 839-050-0130 (providing only that affirmative defenses must be raised or waived).

and that the United States Supreme Court had granted the government's petition for certiorari in *Raich* to decide that question. *Id.* at 115 n 8.

At the hearing in this case, employer told the ALJ that five of its affirmative defenses (including the fifth affirmative defense) were "foreclosed by the *Washburn* decision" but that it was "not withdrawing them." Employer did not explain the basis for that position. We note, however, that the Court of Appeals' conclusion in *Washburn* that ORS 659A.139 does not require absolute symmetry between the state and federal antidiscrimination statutes and its conclusion that medical marijuana use is "not unlawful" under state law effectively foreclosed reliance on ORS 659A.139 and ORS 659A.124 as a basis for employer's fifth affirmative defense. There would be little point in arguing before the ALJ that employee was currently engaged in the illegal use of drugs if, as the Court of Appeals had just stated in *Washburn,* the use of medical marijuana is not illegal.[4] The ALJ issued a proposed order in which it ruled that the Court of Appeals decision in *Washburn* controlled, among other things, employer's fifth affirmative defense.

After the ALJ filed his proposed order, the United States Supreme Court issued its decision in *Raich* and held that Congress had acted within its authority under the Commerce Clause in prohibiting the possession, manufacture, and distribution of marijuana even when state law authorizes its use for medical purposes. 545 US at 33. *Raich* addressed the question that the Court of Appeals had described in *Washburn* as open—whether using marijuana, even for medical purposes, is unlawful under federal law. Employer filed a supplemental exception based on *Raich* and alternatively a request to reopen the record to consider *Raich.* Employer argued that, as a result of *Raich,* "states may not authorize the use of marijuana for medicinal purposes" and that "[t]he impact of this decision is that

---

[4] To be sure, the Court of Appeals reserved the question in *Washburn* whether the use of medical marijuana is unlawful under federal law, but that did not detain it from holding that the employer in that case had an obligation under ORS 659A.112 to accommodate the employee's use of medical marijuana. Given *Washburn*'s holding, employer reasonably conceded its controlling effect until, as noted below, the Supreme Court issued its decision in *Raich.*

[employer] should prevail on its Fourth and Fifth Affirmative Defenses."

BOLI responded that the ALJ should not reopen the record. It reasoned that *Raich* did not invalidate Oregon's medical marijuana law and that, in any event, employer could have raised a preemption argument before the Court issued its decision in *Raich*. Employer replied that, as it read *Raich*, the "Supreme Court has ruled that legalization of marijuana is preempted by federal law. This obviously invalidates the Oregon Medical Marijuana Act." Employer also explained that it had raised this issue in its fourth and fifth affirmative defenses, which "recite[d] that marijuana is an illegal drug under federal law, and that state law deferred to federal law." After considering the parties' arguments, the ALJ allowed employer's motion to reopen the record, stating that "[t]he forum will consider the Supreme Court's ruling in *Raich* to the extent that it is relevant to [employer's] case." Later, the Commissioner ruled that the Controlled Substances Act, which was at issue in *Raich*, did not preempt the Oregon Medical Marijuana Act.

As we read the record, employer took the position before the agency that, like the protections of the federal ADA, the protections of ORS 659A.112 do not apply to a person engaged in the use of illegal drugs, a phrase that, as a result of controlling federal law, includes the use of medical marijuana. We conclude that employer's arguments were sufficient to preserve the issue that it sought to raise on judicial review in the Court of Appeals. To be sure, employer's fifth affirmative defense, as pleaded, turned solely on a question of statutory interpretation. Employer did not raise the preemption issue or argue that federal law required a particular reading of Oregon's statutes until employer asked the ALJ to reopen the record to consider *Raich*. Perhaps the ALJ could have declined to reopen the record. However, once the ALJ chose to reopen the record and the Commissioner chose to address employer's preemption arguments based on *Raich*, then employer's federal preemption arguments were also properly before the agency.[5]

---

[5] After the Commissioner issued his final order in this case, this court reversed the Court of Appeals decision in *Washburn*. *Washburn v. Columbia Forest*

■ As noted, the Court of Appeals reached a different conclusion regarding preservation, and we address its reasoning briefly. The Court of Appeals reasoned that, in telling the ALJ that *Washburn* foreclosed its affirmative defenses, employer adopted the specific defenses that the employer in *Washburn* had asserted and that employer was now limited to those defenses. 220 Or App at 437. The difficulty, the Court of Appeals explained, was that the statutory issues that employer had raised in its affirmative defenses and sought to raise on judicial review differed from the issues that the employer had raised in *Washburn. Id.*

In our view, the Court of Appeals misperceived the import of what employer told the ALJ. Employer reasonably acknowledged that the reasoning in *Washburn* controlled the related but separate defenses that it was raising in this case. Employer did not say that it was advancing the same issues that the employer had asserted in *Washburn,* and the Court of Appeals erred in holding otherwise.

The Court of Appeals also concluded that employer had not preserved its argument regarding the preemptive effect of the Controlled Substances Act, as interpreted in *Raich. Emerald Steel*, 220 Or App at 437-38. It noted that, on judicial review, employer argued that federal law required its interpretation of Oregon's antidiscrimination statutes while it had argued before the agency that federal law preempted the Oregon Medical Marijuana Act. *Id.* We read the record differently. As explained above, employer made both arguments before the agency.[6]

---

*Products, Inc.,* 340 Or 469, 480, 134 P3d 161 (2006). This court held that the employee in *Washburn* was not a disabled person within the meaning of ORS chapter 659A. *Id.* at 479. Given that holding, this court did not reach the other issues that the Court of Appeals had addressed in *Washburn.* After this court's decision in *Washburn,* the commissioner withdrew the final order and issued a revised order on reconsideration, adhering to his earlier resolution of employer's affirmative defenses in this case.

[6] As noted, employer moved to reopen the record on the ground that, as a result of *Raich,* "states may not authorize the use of marijuana for medicinal purposes" and that "[t]he impact of this decision is that [employer] should prevail on its Fourth and Fifth Affirmative Defenses." Employer thus told the agency that the Controlled Substances Act, as interpreted in *Raich,* compelled its interpretation of Oregon's antidiscrimination statutes. Additionally, in response to BOLI's arguments, employer contended that the Controlled Substances Act preempted the Oregon Medical Marijuana Act.

Having concluded that employer preserved the issues it sought to raise on judicial review, we turn to the merits of those issues.[7] Employer's statutory argument begins with ORS 659A.124(1), which provides that "the protections of ORS 659A.112 do not apply to any * * * employee who is currently engaging in the illegal use of drugs if the employer takes action based on that conduct."[8] It follows, employer reasons, that it had no obligation under ORS 659A.112(2)(e) and (f) to reasonably accommodate employee's medical marijuana use. In responding to that argument on the merits, BOLI does not dispute that employee was currently engaged in the use of medical marijuana, nor does it dispute that employer discharged employee for that reason. Rather, BOLI advances two arguments why ORS 659A.124 does not support employer's position.

■　As we understand BOLI's first argument, it contends that, because the commissioner found that employer had violated ORS 659A.112(2)(e) and (f) by failing to engage in a "meaningful interactive process," ORS 659A.124 is inapposite. We reach precisely the opposite conclusion. The commissioner explained that engaging in a "meaningful interactive process" is the "mandatory first step in the process of reasonable accommodation" that ORS 659A.112(2)(e) and (f) require. However, ORS 659A.124 provides that "the protections of ORS 659A.112 do not apply" to an employee who is currently engaged in the illegal use of drugs, if the employer

---

[7] We note that both California and Washington have considered whether their state medical marijuana laws give medical marijuana users either a claim under California's fair employment law or an implied right of action under Washington law against an employer that discharges or refuses to hire a person for off-work medical marijuana use. *See Roe v. Teletech Customer Care Management,* 152 Wash App 388, 216 P3d 1055 (2009); *Ross v. Ragingwire Telecommunications, Inc.,* 42 Cal 4th 920, 174 P3d 200 (2008). Both the California and Washington courts have held that, in enacting their states' medical marijuana laws, the voters did not intend to affect an employer's ability to take adverse employment actions based on the use of medical marijuana. *Roe,* 216 P3d at 1058-61; *Ross,* 174 P3d at 204. Accordingly, in both Washington and California, employers do not have to accommodate their employees' off-site medical marijuana use. We reach the same conclusion, although our analysis differs because Oregon has chosen to write its laws differently.

[8] ORS 659A.124 lists exceptions to that rule, none of which applies here. *See* ORS 659A.124(2) (recognizing exceptions for persons who either are participating in or have successfully completed a supervised drug rehabilitation program and are no longer engaging in the illegal use of drugs).

takes an adverse action based on that use. Under the plain terms of ORS 659A.124, if medical marijuana use is an illegal use of drugs within the meaning of ORS 659A.124, then ORS 659A.124 excused employer from whatever obligation it would have had under ORS 659A.112 to engage in a "meaningful interactive process" or otherwise accommodate employee's use of medical marijuana.

BOLI advances a second, alternative argument. It argues that "employee's use of medical marijuana was entirely legal under state law" and thus not an "illegal use of drugs" within the meaning of ORS 659A.124. BOLI recognizes, as it must, that the federal Controlled Substances Act prohibits possession of marijuana even when used for medical purposes. BOLI's argument rests on the assumption that the phrase "illegal use of drugs" in ORS 659A.124 does not include uses that are legal under state law even though those same uses are illegal as a matter of federal law. BOLI never identifies the basis for that assumption; however, a state statute defines the phrase "illegal use of drugs," as used in ORS 659A.124, and we turn to that statute for guidance in resolving BOLI's second argument.

ORS 659A.122 provides, in part:

"As used in this section and ORS 659A.124, 659A.127 and 659A.130:

"* * * * *

"(2) 'Illegal use of drugs' means any use of drugs, the possession or distribution of which is unlawful under state law or under the federal Controlled Substances Act, 21 U.S.C.A. 812, as amended, but does not include the use of a drug taken under supervision of a licensed health care professional, or other uses authorized under the Controlled Substances Act or under other provisions of state or federal law."[9]

The definition of "illegal use of drugs" divides into two parts. The first part defines the drugs that are included within the definition—all drugs whose use or possession is unlawful under state or federal law. Marijuana clearly falls within the

---

[9] Before 2009, *former* ORS 659A.100(4) (2001) defined the phrase "illegal use of drugs." In 2009, the legislature renumbered that definition as ORS 659A.122(2).

first part of the definition. The second part of the definition excludes certain uses of what would otherwise be an illegal use of a drug. Two exclusions are potentially applicable here: (1) the exclusion for "uses authorized under * * * other provisions of state * * * law" and (2) the exclusion for "the use of a drug taken under supervision of a licensed health care professional." We consider each exclusion in turn.

We begin with the question whether employee's use of medical marijuana is a "us[e] authorized under * * * other provisions of state * * * law." We conclude that, as a matter of statutory interpretation, it is an authorized use. The Oregon Medical Marijuana Act affirmatively authorizes the use of medical marijuana, in addition to exempting its use from state criminal liability. Specifically, ORS 475.306(1) provides that "[a] person who possesses a registry identification card * * * may engage in * * * the medical use of marijuana" subject to certain restrictions. ORS 475.302(10), in turn, defines a registry identification card as "a document * * * that identifies a person authorized to engage in the medical use of marijuana." Reading those two subsections together, we conclude that ORS 475.306(1) affirmatively authorizes the use of marijuana for medical purposes[10] and, as a statutory matter, brings the use of medical marijuana within one of the exclusions from the "illegal use of drugs" in ORS 659A.122(2).[11]

---

[10] The ballot title for the Oregon Medical Marijuana Act confirms that interpretation of the act. *See State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009) (looking to legislative history to confirm text). The caption, "yes" vote result statement, and summary of the ballot title focused on the fact that the measure, if enacted, would allow permit-holders to use medical marijuana and referred to the exemption from criminal laws only at the end of the summary. Official Voters' Pamphlet, Nov 3, 1998, 148. The caption stated that the measure "[a]llows medical use of marijuana within limits; establishes permit system." The "yes" vote result statement was to the same effect, and the summary stated that current law prohibits the possession and manufacture of marijuana but that the measure "allows engaging in, assisting in, medical use of marijuana." *Id.* Only at the end of the summary did the ballot title add that the measure "excepts permit holder or applicant from marijuana criminal statutes." *Id.*

[11] The Oregon Medical Marijuana Act also exempts medical marijuana use from state criminal liability. *See* ORS 475.309(1) (excepting persons holding registry identification cards from certain state criminal prohibitions); ORS 475.319 (creating an affirmative defense to certain criminal prohibitions for persons who do not hold registry identification cards but who have complied with the conditions necessary to obtain one). Because ORS 659A.122(2) excludes from the definition of illegal use of drugs only those uses authorized by state law, the provisions of the Oregon Medical Marijuana Act that are relevant here are those provisions that

■ Employer argues, however, that the Supremacy Clause of the United States Constitution requires that we interpret Oregon's statutes consistently with the federal Controlled Substances Act. We understand employer's point to be that, to the extent that ORS 475.306(1) affirmatively authorizes the use of medical marijuana, federal law preempts that subsection and that, without any effective state law authorizing the use of medical marijuana, employee's use of that drug was an "illegal use of drugs" within the meaning of ORS 659A.124.[12] We turn to that question and begin by setting out the general principles that govern preemption. We then discuss the federal Controlled Substances Act and finally turn to whether the Controlled Substances Act preempts the Oregon Medical Marijuana Act to the extent that state law affirmatively authorizes the use of medical marijuana.

■ The United States Supreme Court recently summarized the general principles governing preemption:

> "Our inquiry into the scope of a statute's pre-emptive effect is guided by the rule that ' "[t]he purpose of Congress is the ultimate touchstone" in every pre-emption case.' *Medtronic, Inc. v. Lohr*, 518 US 470, 485, 116 S Ct 2240, 135 L Ed 2d 700 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 US 96, 103, 84 S Ct 219, 11 L Ed 2d 179 (1963)). Congress may indicate a pre-emptive intent through a statute's express language or through its structure and purpose. *See Jones v. Rath Packing Co.*, 430 US 519, 525, 97 S Ct 1305, 51 L Ed 2d 604 (1977). * * * Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and

---

affirmatively authorize the use of medical marijuana, as opposed to those provisions that exempt its use from criminal liability.

[12] The only issue that employer's preemption argument raises is whether federal law preempts ORS 475.306(1) to the extent that it authorizes the use of medical marijuana. In holding that federal law does preempt that subsection, we do not hold that federal law preempts the other sections of the Oregon Medical Marijuana Act that exempt medical marijuana use from criminal liability. We also express no opinion on the question whether the legislature, if it chose to do so and worded Oregon's disability law differently, could require employers to reasonably accommodate disabled employees who use medical marijuana to treat their disability. Rather, our opinion arises from and is limited to the laws that the Oregon legislature has enacted.

federal law. *Freightliner Corp. v. Myrick*, 514 US 280, 287, 115 S Ct 1483, 131 L Ed 2d 385 (1995).

"When addressing questions of express or implied pre-emption, we begin our analysis 'with the assumption that the historic police powers of the States [are] not to be super-seded by the Federal Act unless that was the clear and manifest purpose of Congress.' *Rice v. Santa Fe Elevator Corp.*, 331 US 218, 230, 67 S Ct 1146, 91 L Ed 1447 (1947)."

*Altria Group, Inc. v. Good*, 555 US 70, ____ , 129 S Ct 538, 543, 172 L Ed 2d 398 (2008).

■ With those principles in mind, we turn to the Controlled Substances Act. The central objectives of that act "were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances. Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels." *Raich*, 545 US at 12-13 (footnotes omitted). To accomplish those objectives, Congress created a comprehensive, closed regulatory regime that criminalizes the unauthorized manufacture, distribu-tion, dispensation, and possession of controlled substances classified in five schedules. *Id.* at 13.

The Court has explained that:

"Schedule I drugs are categorized as such because of their high potential for abuse, lack of any accepted medical use, and absence of any accepted safety for use in medically supervised treatment. [21 USC] § 812(b)(1). These three factors, in varying gradations, are also used to categorize drugs in the other four schedules. For example, Schedule II substances also have a high potential for abuse which may lead to severe psychological or physical dependence, but unlike Schedule I drugs, they have a currently accepted medical use. [21 USC] § 812(b)."

*Id.* at 14. Consistent with Congress's determination that the controlled substances listed in Schedule II through V have currently accepted medical uses, the Controlled Substances Act authorizes physicians to prescribe those substances for medical use, provided that they do so within the bounds of professional practice. *See United States v. Moore*, 423 US 122, 142-43, 96 S Ct 335, 46 L Ed 2d 333 (1975).[13] By contrast,

---

[13] Two subsections of the Controlled Substances Act accomplish that result. Section 823(f) directs the Attorney General to register physicians and other

because Schedule I controlled substances lack any accepted medical use, federal law prohibits *all* use of those drugs "with the sole exception being use of [Schedule I] drug[s] as part of a Food and Drug Administration preapproved research project." *Raich*, 545 US at 14; *see* 21 USC § 823(f) (recognizing that exception for the use of Schedule I drugs).

Congress has classified marijuana as a Schedule I drug, 21 USC § 812(c), and federal law prohibits its manufacture, distribution, and possession, 21 USC § 841(a)(1). Categorizing marijuana as a Schedule I drug reflects Congress's conclusion that marijuana "lack[s] any accepted medical use, and [that there is an] absence of any accepted safety for use in medically supervised treatment." *Raich*, 545 US at 14 (citing 21 USC § 812(b)(1)). Consistently with that classification, the Court has concluded that the Controlled Substances Act does not contain a "medical necessity" exception that permits the manufacture, distribution, or possession of marijuana for medical treatment. *Oakland Cannabis Buyers' Cooperative*, 532 US at 494 and n 7.[14] Despite efforts to reclassify marijuana, it has remained a Schedule I drug since the enactment of the Controlled Substances Act. *See Raich*, 545 US at 14-15 and n 23 (summarizing "considerable efforts," ultimately unsuccessful, to reschedule marijuana).

Section 903 of the Controlled Substances Act addresses the relationship between that act and state law. It provides:

"No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same

---

practitioners to dispense controlled substances listed in Schedule II through V. 21 USC § 823(f). Section 822(b) authorizes persons registered with the Attorney General to dispense controlled substances "to the extent authorized by their registration and in conformity with the other provisions of this subchapter." 21 USC § 822(b).

[14] The specific question in *Oakland Cannabis Buyers' Cooperative* was whether there was a medical necessity exception for manufacturing and distributing marijuana. The Court explained, however, that, "[l]est there be any confusion, we clarify that nothing in our analysis, or the statute, suggests that a distinction should be drawn between the prohibitions on manufacturing and distributing and the other prohibitions in the Controlled Substances Act." 532 US at 494 n 7.

subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together."

21 USC § 903. Under the terms of section 903, states are free to pass laws "on the same subject matter" as the Controlled Substances Act unless there is a "positive conflict" between state and federal law "so that the two cannot consistently stand together."

When faced with a comparable preemption provision, the Court recently engaged in an implied preemption analysis to determine whether a federal statute preempted state law. *Wyeth v. Levine,* ___ US ___ , ___ , 129 S Ct 1187, 1196-1200, 173 L Ed 2d 51 (2009).[15] That is, the Court asked whether there is an "actual conflict" between state and federal law. An actual conflict will exist either when it is physically impossible to comply with both state and federal law or when state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Freightliner Corp.,* 514 US at 287 (quoting *Hines v. Davidowitz,* 312 US 52, 67, 61 S Ct 399, 85 L Ed 2d 581 (1941)).

The Court has applied the physical impossibility prong narrowly. *Wyeth,* 129 S Ct at 1199 (so stating); *id.* at 1209 (Thomas, J., concurring in the judgment).[16] For example, in *Barnett Bank v. Nelson,* 517 US 25, 116 S Ct 1103, 134

---

[15] The provision at issue in *Wyeth* provided that the federal statute did not preempt state law unless there was a "direct and positive" conflict between state and federal law. 129 S Ct at 1196. At first blush, one might think that the Court would have looked to the standard that Congress had expressly provided—whether there is a "direct and positive conflict" between the state and federal laws—to determine the extent to which federal law preempts state law. *See Cipollone v. Liggett Group, Inc.,* 505 US 504, 517, 112 S Ct 2608, 120 L Ed 2d 407 (1992) (holding that the preemptive effect of a federal act is "governed entirely" by an express preemption provision). Implied preemption, however, addresses a similar issue, and the Court used an implied preemption analysis in *Wyeth* without any discussion. 129 S Ct at 1196-1200. Given *Wyeth,* we follow a similar course here.

[16] Justice Thomas noted that the Court had used different formulations to explain when it would be physically impossible to comply with both state and federal laws and questioned whether the Court had applied that standard too strictly. *Wyeth,* 129 S Ct at 1208-09 (opinion concurring in the judgment). In his view, the physical impossibility test is too narrow, and asking whether state law stands as an obstacle to the purposes of the federal law too amorphous. He would have asked whether the state and federal law are in direct conflict. *Id.; see* Caleb Nelson,

L Ed 2d 237 (1996), the question was whether "a federal stat-
ute that permits national banks to sell insurance in small
towns pre-empts a state statute that forbids them to do so."
*Id.* at 27. Although the two statutes were logically inconsis-
tent, the Court held that it was not physically impossible to
comply with both. *Id.* at 31. A national bank could simply
refrain from selling insurance. *See Wyeth*, 129 S Ct at 1209
(Thomas, J., concurring in the judgment) (explaining physi-
cal impossibility test).

Under that reasoning, it is not physically impossible
to comply with both the Oregon Medical Marijuana Act and
the federal Controlled Substances Act. To be sure, the two
laws are logically inconsistent; state law authorizes what fed-
eral law prohibits. However, a person can comply with both
laws by refraining from any use of marijuana, in much the
same way that a national bank could comply with state and
federal law in *Barnett Bank* by simply refraining from selling
insurance.

Because the "physical impossibility" prong of
implied preemption is "vanishingly narrow," Caleb Nelson,
*Preemption*, 86 Va L Rev 225, 228 (2000), the Court's deci-
sions typically have turned on the second prong of implied
preemption analysis—whether state law "stands as an obsta-
cle to the accomplishment and execution of the full purposes
and objectives of Congress." *See Hines*, 312 US at 67 (stating
test). In *Barnett Bank*, for example, the Court stated, as a
self-evident proposition, that a state law that prohibited
national banks from selling insurance when federal law per-
mitted them to do so would stand as an obstacle to the full
accomplishment of Congress's purpose, but it then added
"unless, of course, that federal purpose is to grant [national]
bank[s] only a very *limited* permission, that is, permission to
sell insurance *to the extent that state law also grants permis-
sion to do so.*" *Barnett Bank*, 517 US at 31 (emphasis in orig-
inal). Having considered the text and history of the federal
statute and finding no basis for implying such a limited per-
mission, the Court held that the state statute was pre-
empted. *Id.* at 35-37.

---

*Preemption*, 86 Va L Rev 225, 260-61 (2000) (reasoning that historically and prac-
tically preemption reduces to a "logical contradiction" test).

The Court has reached the same conclusion when, as in this case, state law permits what federal law prohibits. *Michigan Canners & Freezers v. Agricultural Bd.*, 467 US 461, 104 S Ct 2518, 81 L Ed 2d 399 (1984). In *Michigan Canners*, federal law prohibited food producers' associations from interfering with an individual food producer's decision whether to bring that individual's products to the market on his or her own or to sell them through the association. *Id.* at 464-65. Michigan law on this issue generally tracked federal law; however, Michigan law permitted food producers' associations to apply to a state board for authority to act as the exclusive bargaining agent for all producers of a particular commodity. *Id.* at 466. When the state board gave a producer's association that authority, all producers of a commodity had to adhere to the terms of the contracts that the association negotiated with food processors, even when the producer had declined to join the association. *Id.* at 467-68.

In considering whether federal law preempted the Michigan law, the Court held initially that it was physically possible to comply with both state and federal law. The Court reasoned that, because the "Michigan Act is cast in permissive rather than mandatory terms—an association *may*, but need not, act as exclusive bargaining representative—this is not a case in which it is [physically] impossible for an individual to comply with both state and federal law." *Id.* at 478 n 21 (emphasis in original). The Court went on to conclude, however, that "because the Michigan Act authorizes producers' associations to engage in conduct that the federal Act forbids, it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 478 (quoting *Hines*, 312 US at 67).

The preemption issue in this case is similar to the issue in *Michigan Canners* and *Barnett Bank*. In this case, ORS 475.306(1) affirmatively authorizes the use of medical marijuana. The Controlled Substances Act, however, prohibits the use of marijuana without regard to whether it is used for medicinal purposes. As the Supreme Court has recognized, by classifying marijuana as a Schedule I drug, Congress has expressed its judgment that marijuana has no recognized medical use. *See Raich*, 545 US at 14. Congress did not intend to enact a limited prohibition on the use of

marijuana—*i.e.*, to prohibit the use of marijuana unless states chose to authorize its use for medical purposes. *Cf. Barnett Bank*, 517 US at 31-35 (reaching a similar conclusion regarding the scope of the national bank act). Rather, Congress imposed a blanket federal prohibition on the use of marijuana without regard to state permission to use marijuana for medical purposes. *Oakland Cannabis Buyers' Cooperative*, 532 US at 494 and n 7.

Affirmatively authorizing a use that federal law prohibits stands as an obstacle to the implementation and execution of the full purposes and objectives of the Controlled Substances Act. *Michigan Canners*, 467 US at 478. To be sure, state law does not prevent the federal government from enforcing its marijuana laws against medical marijuana users in Oregon if the federal government chooses to do so. But the state law at issue in *Michigan Canners* did not prevent the federal government from seeking injunctive and other relief to enforce the federal prohibition in that case. Rather, state law stood as an obstacle to the enforcement of federal law in *Michigan Canners* because state law affirmatively authorized the very conduct that federal law prohibited, as it does in this case.

To the extent that ORS 475.306(1) affirmatively authorizes the use of medical marijuana, federal law preempts that subsection, leaving it "without effect." *See Cipollone v. Liggett Group, Inc.*, 505 US 504, 516, 112 S Ct 2608, 120 L Ed 2d 407 (1992) ("[S]ince our decision in *McCulloch v. Maryland*, 4 Wheat. 316, 427 (1819), it has been settled that state law that conflicts with federal law is 'without effect.' "). Because ORS 475.306(1) was not enforceable when employer discharged employee, no enforceable state law either authorized employee's use of marijuana or excluded its use from the "illegal use of drugs," as that phrase is defined in ORS 659A.122(2) and used in ORS 659A.124. It follows that BOLI could not rely on the exclusion in ORS 659A.122(2) for "uses authorized * * * under other provisions of state * * * law" to conclude that medical marijuana use was not an illegal use of drugs within the meaning of ORS 659A.124.

The commissioner reached a different conclusion regarding preemption, as would the dissenting opinion. We address the commissioner's reasoning before turning to the dissent. The commissioner, for his part, adopted the reasoning from an informal Attorney General opinion, dated June 17, 2005, which concluded that the Controlled Substances Act does not invalidate the Oregon Medical Marijuana Act. Letter of Advice dated June 17, 2005, to Susan M. Allan, Public Health Director, Department of Human Services. In reaching that conclusion, the Attorney General focused on those parts of the Oregon Medical Marijuana Act that either exempt medical marijuana users from state criminal liability or provide an affirmative defense to criminal charges. *Id.* at 2.[17] In concluding that those exemptions from state criminal liability were valid, the Attorney General relied on a line of federal cases holding that "Congress cannot compel the States to enact or enforce a federal regulatory program." *See Printz v. United States*, 521 US 898, 935, 117 S Ct 2365, 138 L Ed 2d 914 (1997) (so stating); *New York v. United States*, 505 US 144, 162, 112 S Ct 2408, 120 L Ed 2d 120 (1992) (stating that "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress's instructions"). The Attorney General concluded that Oregon was free, as a matter of state law, to exempt medical marijuana use from criminal liability because Congress lacks the authority to require Oregon to prohibit that use.

The Attorney General's opinion has no bearing on the issue presented in this case for two reasons. First, as noted, one subsection of the Oregon Medical Marijuana Act affirmatively authorizes the use of medical marijuana. ORS

---

[17] The Attorney General's opinion stated that the Oregon Medical Marijuana Act "protects users who comply with its requirements from state criminal prosecution for production, possession, or delivery of a controlled substance." Letter Opinion at 2. In support of that statement, the opinion cited *former* ORS 475.306(2) (2003), which provided an affirmative defense for persons who possessed excess amounts of marijuana if possession of that amount of marijuana were medically necessary. *See* Or Laws 2005, ch 822, § 2 (repealing that provision). The opinion also cited ORS 475.319 and ORS 475.309(9), which provides an affirmative defense to criminal liability for persons who have applied for but not yet received a registry identification card.

475.306(1). Other provisions exempt its use from state criminal liability. *See, e.g.*, ORS 475.309(1); ORS 475.319. In this case, only the validity of the authorization matters. ORS 659A.122(2) excludes medical marijuana use from the definition of "illegal use of drugs" for the purposes of the state employment discrimination laws if state law authorizes that use. The Attorney General's opinion, however, addresses only the validity of the exemptions; it does not address the validity of the authorization found in ORS 475.306(1). It thus does not address the issue that is central to the resolution of this case.

Second, and more importantly, the validity of the exemptions and the validity of the authorization turn on different constitutional principles. The Attorney General reasoned that the exemptions from criminal liability are valid because "Congress cannot compel the States to enact or enforce a federal regulatory program"—a restriction that derives from Congress's limited authority under the federal constitution. *See Printz*, 521 US at 935 (stating limited authority); *New York*, 505 US at 161-66 (describing the sources of that limitation). Under the Attorney General's reasoning and the United States Supreme Court decisions on which his opinion relies, Congress lacks authority to require states to criminalize conduct that the states choose to leave unregulated, no matter how explicitly Congress directs the states to do so.

By contrast, there is no dispute that Congress has the authority under the Supremacy Clause to preempt state laws that affirmatively authorize the use of medical marijuana. Whether Congress has exercised that authority turns on congressional intent: that is, did Congress intend to preempt the state law? *See Cipollone*, 505 US at 516 (describing preemption doctrine). More specifically, the constitutional question in this case is whether, under the doctrine of implied preemption, a state law authorizing the use of medical marijuana "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Hines*, 312 US at 67 (stating that test). Nothing in the Attorney General's opinion addresses that question, and the commissioner erred in finding an answer in the Attorney

General's opinion to a question that the Attorney General never addressed.

The dissent addresses the issue that the Attorney General's opinion did not and would hold for alternative reasons that ORS 475.306(1) does not stand as an obstacle to the full accomplishment of Congress's purposes in enacting the Controlled Substances Act. The dissent reasons that, because ORS 475.306(1) does not "giv[e] permission to violate the Controlled Substances Act or affec[t] its enforcement, [that subsection] does not pose an obstacle to the federal act necessitating a finding of implied preemption." 348 Or at 197 (Walters, J., dissenting).[18] In the dissent's view, the fact that a state law affirmatively authorizes conduct that federal law explicitly forbids is not sufficient to find that the state law poses an obstacle to the full accomplishment of the purposes of the federal law and is thus preempted. The dissent also advances what appears to be an alternative basis for its position. It reasons that the Oregon Medical Marijuana Act, as a whole, exempts medical marijuana use from state criminal liability and that ORS 475.306(1) is merely one part of that larger exemption. It appears to draw two different legal conclusions from that alternative proposition. It suggests that, to the extent ORS 475.306(1) merely exempts medical marijuana use from criminal liability, then Congress lacks power to require states to criminalize that conduct under the line of cases that the Attorney General cited. Alternatively, it suggests that, because authorization is merely the other side of the coin from exemption, authorizing medical marijuana use poses no more of an obstacle to the accomplishment of the purposes of the Controlled Substances Act than exempting that use from state criminal liability and thus that use is not preempted. We begin with the test that the dissent would employ in obstacle preemption cases.

---

[18] The dissent phrases the test it would apply in various ways throughout its opinion. For instance, it begins its opinion by stating that the Oregon Medical Marijuana Act neither "permits [n]or requires the violation of the Controlled Substances Act." 348 Or at 190 (Walters, J., dissenting). Because the Oregon Medical Marijuana Act permits (and indeed authorizes) conduct that violates the Controlled Substances Act, we understand the dissent to use the word "permits" to mean expressly purports to "giv[e] permission," as it later rephrases its test. We also note that, if the Oregon Medical Marijuana Act "required" a violation of federal law, then the physical impossibility prong of implied preemption would apply.

As noted, the dissent would hold that a state law stands as an obstacle to the execution and accomplishment of the full purposes of a federal law (and is thus preempted) if the state law purports to override federal law either by giving permission to violate the federal law or by preventing the federal government from enforcing its laws. We do not disagree that such a law would be an obstacle. But it does not follow that anything less is not an obstacle. Specifically, we disagree with the dissent's view that a state law that specifically authorizes conduct that a federal law expressly forbids does not pose an obstacle to the full accomplishment of the purposes of the federal law and is not preempted.

If Congress chose to prohibit anyone under the age of 21 from driving, states could not authorize anyone over the age of 16 to drive and give them a license to do so. The state law would stand as an obstacle to the accomplishment of the full purposes and objectives of Congress (keeping everyone under the age of 21 off the road) and would be preempted. Or, to use a different example, if federal law prohibited all sale and possession of alcohol, a state law licensing the sale of alcohol and authorizing its use would stand as an obstacle to the full accomplishment of Congress's purposes. ORS 475.306(1) is no different. To the extent that ORS 475.306(1) authorizes persons holding medical marijuana licenses to engage in conduct that the Controlled Substances Act explicitly prohibits, it poses the same obstacle to the full accomplishment of Congress's purposes (preventing all use of marijuana, including medical uses).

The dissent, however, reasons that one state case and four federal cases support its view of obstacle preemption. It reads *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993), as providing direct support for its view. *See* 348 Or at 197 (Walters, J., dissenting). In *Rodriguez*, federal Immigration and Naturalization Service (INS) agents obtained evidence pursuant to a federal administrative warrant that was valid under federal law but not under the Oregon Constitution, and the question was whether suppressing evidence obtained pursuant to that warrant in a

state criminal proceeding was an obstacle to the accomplishment of the full purposes and objectives of the federal immigration laws. This court held that it was not. Suppressing evidence in the state criminal proceeding was completely unrelated to the INS's ability to carry out its separate mission of enforcing the federal immigration laws in a federal administrative proceeding. This court did not hold in *Rodriguez*, as the dissent appears to conclude, that state law will be an obstacle to the full accomplishment of the purposes of the federal law only if state law interferes with the federal government's ability to enforce its laws.

The dissent also relies on four United States Supreme Court cases "for the proposition that states may impose standards of conduct different from those imposed by federal law without creating an obstacle to the federal law." 348 Or at 199 (Walters, J., dissenting). It follows, the dissent reasons, that the mere fact that state law authorizes conduct that federal law forbids does not mean that state law is an obstacle to the accomplishment of the purposes of the federal law. The four cases on which the dissent relies stand for a narrower proposition than the dissent draws from them. In interpreting the applicable federal statute in each of those cases, the Court concluded that Congress intended to leave states free to impose complementary or supplemental regulations on a person's conduct. None of those cases holds that states can authorize their citizens to engage in conduct that Congress explicitly has forbidden, as ORS 475.306(1) does.

In *Wyeth*, one of the cases on which the dissent relies, the defendant argued that permitting state tort remedies based on a drug manufacturer's failure to warn would "interfere with 'Congress's purpose to entrust an expert agency to make drug labeling decisions that strike a balance between competing objectives.'" 129 S Ct at 1199 (quoting the defendant's argument). After considering the history of the federal statute, the Court concluded that "Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness." *Id.* at 1200. The Court concluded instead that Congress intended to allow complementary state tort remedies. *Id.* Given that interpretation of the federal law, the Court determined that the state tort remedy

was consistent with, and not an obstacle to, Congress's purpose in requiring warnings in the first place. Put differently, the state law was not an obstacle to Congress's purpose because Congress intended to permit states to continue enforcing complementary tort remedies.

The Court's opinion in *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 US 132, 83 S Ct 1210, 10 L Ed 2d 248 (1963), on which the dissent also relies, is to the same effect. In that case, the Court determined that a federal marketing order setting minimum standards for picking, processing, and transporting avocados did not reflect a congressional intent to prevent states from enacting laws governing "the distribution and retail sale of those commodities." 373 US at 145. As the Court explained, "[c]ongressional regulation at one end of the stream of commerce does not, *ipso facto*, oust all state regulation at the other end." *Id.* The Court accordingly concluded that there was "no irreconcilable conflict with the federal regulation [that] require[d] a conclusion that [the state law] was displaced." *Id.* at 146.[19] The Court's reasoning implies that, when, as in this case, there is an irreconcilable conflict between state and federal law, that conflict "requires a conclusion that [the state law] [i]s displaced." *See id.*

In both *Florida Lime & Avocado* and *Wyeth* and the other two cases the dissent cites, the Court interpreted the applicable federal statute to permit complementary or supplementary state law.[20] None of those cases considered state

---

[19] The dissenting opinion quotes the dissent in *Florida Lime & Avocado* for the proposition that the conflict between state and federal law in that case was unmistakable. *See* 348 Or at 200-01 (Walters, J., dissenting) (quoting *Florida Lime & Avocado*, 373 US at 173 (White, J., dissenting)). The majority, however, disagreed on that point, 373 US at 145-46, and its conclusion that federal law left room for complementary state law was pivotal to its conclusion that the federal marketing order did not preempt California law.

[20] The other two United States Supreme Court cases on which the dissent relies are to the same effect. Neither case involved a federal statute that, as the Court interpreted it, prohibited what the state law authorized. *See California v. ARC America Corp.*, 490 US 93, 103, 109 S Ct 1661, 104 L Ed 2d 86 (1989) (explaining that nothing in an earlier decision that only direct purchasers may bring an action under section 4 of the Clayton Act "suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws"); *Silkwood v. Kerr-McGee Corp.*, 464 US 238, 256, 104 S Ct 615, 78 L Ed 2d 443 (1984) (holding that, even though Congress "was well aware of the NRC's exclusive authority to regulate safety matters," Congress also had "assumed

laws that authorized conduct that the federal law specifically prohibited, as is present in this case, and none of those cases stands for the proposition that such a law would not be an obstacle to the accomplishment of the full purposes of Congress. Rather, the Court's opinion in *Florida Lime & Avocado* points in precisely the opposite direction; it teaches that when, as in this case, the state and federal laws are in "irreconcilable conflict," federal law will displace state law. *See* 373 US at 146.

As noted, the dissent also advances what appears to be an alternative ground for its position. The dissent reasons that ORS 475.306(1) does not affirmatively authorize the use of medical marijuana; it views that subsection instead as part of a larger exemption of medical marijuana use from state criminal laws. The dissent's reasoning is difficult to square with the text of ORS 475.306(1). That subsection provides that a person holding a registry identification card "may engage" in the limited use of medical marijuana. Those are words of authorization, not exemption. Beyond that, if ORS 475.306(1) were merely part of a larger exemption, then no provision of state law would authorize the use of medical marijuana. If that were true, medical marijuana use would not come within one of the exclusions from the "illegal use of drugs," as that phrase is defined in ORS 659A.122, and the protections of ORS 659A.112 would not apply to employee. *See* ORS 659A.124 (so providing).[21]

Another thread runs through the dissent. It reasons that, as a practical matter, authorizing medical marijuana use is no different from exempting that use from criminal liability. It concludes that, if exempting medical marijuana use from criminal liability is not an obstacle to the accomplishment of the purposes of the Controlled Substances Act and is

that state law remedies, in whatever form they might take, were available to those injured in nuclear incidents").

[21] There is a suggestion in the dissent that ORS 475.306(1) is integral to the goal of exempting medical marijuana use from state criminal liability and cannot be severed from the remainder of the Oregon Medical Marijuana Act. That act, however, contains an express severability clause, and it is not apparent why the provisions exempting medical marijuana use from state criminal liability cannot "be given full effect without [the authorization to use medical marijuana found in ORS 475.306(1)]." *See* Or Laws 1999, ch 4, § 18 (providing the terms for severing any part of the act held invalid).

thus not preempted, then neither is a state law authorizing medical marijuana use. The difficulty with the dissent's reasoning is its premise. It presumes that a law exempting medical marijuana use from liability is valid because it is not preempted. As the Attorney General's opinion explained, however, Congress lacks the authority to compel a state to criminalize conduct, no matter how explicitly it directs a state to do so. When, however, a state affirmatively authorizes conduct, Congress has the authority to preempt that law and did so here. The dissent's reasoning fails to distinguish those two analytically separate constitutional principles.

In sum, whatever the wisdom of Congress's policy choice to categorize marijuana as a Schedule I drug, the Supremacy Clause requires that we respect that choice when, as in this case, state law stands as an obstacle to the accomplishment of the full purposes of the federal law. Doing so means that ORS 475.306(1) is not enforceable. Without an enforceable state law authorizing employee's use of medical marijuana, that basis for excluding medical marijuana use from the phrase "illegal use of drugs" in ORS 659A.122(2) is not available.

 As noted, a second possible exclusion from the definition of "illegal use of drugs" exists, which we also address. The definition of "illegal use of drugs" also excludes from that phrase "the use of a drug taken under supervision of a licensed health care professional."[22] ORS 659A.122(2). On that issue, as noted above, employee's physician signed a statement that employee had been diagnosed with a debilitating condition, that marijuana may mitigate the symptoms or effects of that condition, but that the physician's statement was not a prescription to use marijuana. That statement was sufficient under the Oregon Medical Marijuana Act to permit

---

[22] The commissioner did not consider whether this exclusion applied, in part because the Court of Appeals had stated in *Washburn* that the use of marijuana for medical purposes was "not unlawful," which the parties and the commissioner concluded was sufficient to answer employer's reliance on ORS 659A.124. Although we could remand this case to the commissioner to permit him to address whether this exclusion applies, its application in this case turns solely on an issue of statutory interpretation, an issue on which we owe the commissioner no deference. In these circumstances, we see no need to remand and unnecessarily prolong the resolution of this case.

employee to obtain a registry identification card, which then permitted him to use marijuana to treat his condition. Employee's physician recommended that employee use marijuana five to seven times daily by inhalation. However, without a prescription, employee's physician had no ability to control either the amount of marijuana that employee used or the frequency with which he used it, if employee chose to disregard his physician's recommendation.

The question thus posed is whether employee used marijuana "under supervision of a licensed health care professional." The answer to that question turns initially on what a person must show to come within that exclusion. As explained below, we conclude that two criteria must be met to come within the exclusion. As an initial matter, the phrase "taken under supervision" of a licensed health care professional implies that the health care professional is monitoring or overseeing the patient's use of what would otherwise be an illegal drug. *See Webster's Third New Int'l Dictionary* 2296 (unabridged ed 2002) (defining supervise as "coordinate, direct, and inspect continuously and at first hand the accomplishment of" a task); *cf. Moore*, 423 US at 143 (holding that a physician who prescribed methadone, a Schedule II controlled substance, without regulating his patients' dosage and with no precautions against his patients' misuse of methadone violated section 841 of the Controlled Substances Act).

Beyond supervision, when a health care professional administers a controlled substance, the exclusion requires that the Controlled Substances Act authorize him or her to do so. That follows from the text and context of the definition of illegal use of drugs set out in ORS 659A.122(2). After providing that the illegal use of drugs does not include "the use of a drug taken under supervision of a licensed health care professional," the legislature added "or other uses authorized under the Controlled Substances Act." The phrase "or other uses authorized by the Controlled Substances Act" is telling. The words "other uses" imply that the preceding use (the use of drugs taken under supervision of a licensed health care professional) also refers to a use authorized by the Controlled Substances Act. *See Webster's* at 1598 (defining "other" as "being the one (as of two or more) left").

Not only does the text of ORS 659A.122(2) imply that the use of controlled substances taken under supervision of a licensed health care professional refers to uses that the Controlled Substances Act authorizes, but the context leads to the same conclusion. *See Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) (explaining that context includes " 'the preexisting common law and the statutory framework within which the law was enacted' ") (quoting *Denton and Denton*, 326 Or 236, 241, 951 P2d 693 (1998)). As noted, the Controlled Substances Act both authorizes physicians and other health care professionals to administer controlled substances for medical and research purposes and defines the scope of their authority to do so. *See Moore*, 423 US at 138-40 (so holding). We infer that, in excluding "the use of a drug taken under supervision of licensed health care professionals" from the phrase "illegal use of drugs," the legislature intended to refer to those medical and research uses that, under the Controlled Substances Act, physicians and other health care professionals lawfully can put controlled substances.

Another contextual clue points in the same direction. The exclusion in ORS 659A.122(2) for the use of a drug taken under supervision of a licensed health care professional is virtually identical to an exclusion in the definition of illegal use of drugs found in the ADA. *See* 42 USC § 12111(6)(A) (excluding "the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act"). The federal exclusion contemplates medical and research uses that the Controlled Substances Act authorizes, and there is no reason to think that, in adopting the same exclusion, the Oregon legislature had any different intent in mind. *Cf. Stevens*, 336 Or at 402-03 (looking to the federal counterpart to ORCP 36 to determine Oregon legislature's intent). Given the text and context of ORS 659A.122(2), we conclude that, when a health care professional administers a controlled substance, the exclusion for the "use of a drug taken under supervision of a licensed health care professional" refers to those medical and research uses that the Controlled Substances Act authorizes.

In sum, two criteria are necessary to come within the exclusion for the use of a controlled substance taken under supervision of a licensed health care professional: (1) the Controlled Substances Act must authorize a licensed health care professional to prescribe or administer the controlled substance and (2) the health care professional must monitor or supervise the patient's use of the controlled substance. In this case, we need not decide whether the evidence was sufficient to prove the second criterion—*i.e.*, whether employee's physician monitored or oversaw employee's use of marijuana. Even if it were, the Controlled Substances Act did not authorize employee's physician to administer (or authorize employee to use) marijuana for medical purposes. As noted, under the Controlled Substances Act, physicians may not prescribe Schedule I controlled substances for medical purposes. At most, a physician may administer those substances only as part of a Food and Drug Administration preapproved research project.[23] Because there is no claim in this case that employee and his physician were participating in such a project, employee's use of marijuana was not taken under supervision of a licensed health care professional, as that phrase is used in ORS 659A.122(2).

Because employee did not take marijuana under supervision of a licensed health care professional and because the authorization to use marijuana found in ORS 475.306(1) is unenforceable, it follows that employee was currently engaged in the illegal use of drugs and, as the commissioner found, employer discharged employee for that reason. Under the terms of ORS 659A.124, "the protections of ORS 659A.112 do not apply" to employee. The commissioner's final order on reconsideration rests, however, on the premise

---

[23] *Gonzales v. Oregon*, 546 US 243, 126 S Ct 904, 163 L Ed 2d 748 (2006), addressed a different issue from the one presented here. The Controlled Substances Act provides that Schedule II controlled substances have accepted medical uses, and the issue in *Gonzales* was whether the Attorney General had exceeded his statutory authority in defining which uses of Schedule II controlled substances were legitimate medical uses. In this case, by contrast, the Controlled Substances Act provides that Schedule I controlled substances, such as marijuana, have no accepted medical use. That congressional policy choice both addresses and conclusively resolves the issue that the Attorney General lacked statutory authority to address in *Gonzales*.

that the protections of ORS 659A.112—specifically, the requirement for employer to engage in a "meaningful interactive process" as an aspect of reasonable accommodation—do apply to employee. Under ORS 659A.124, that premise is mistaken, and the commissioner's revised order on reconsideration cannot stand. Both the commissioner's order and the Court of Appeals decision affirming that order on procedural grounds must be reversed.

Given the number of the issues discussed in this opinion, we summarize the grounds for our decision briefly. First, employer preserved its challenge that, as a result of the Controlled Substances Act, the use of medical marijuana is an illegal use of drugs within the meaning of ORS 659A.124. Second, two potentially applicable exclusions from the phrase "illegal use of drugs"—the use of drugs authorized by state law and the use of drugs taken under the supervision of a licensed health care professional—do not apply here. Third, regarding the first potentially applicable exclusion, to the extent that ORS 475.306(1) authorizes the use of medical marijuana, the Controlled Substances Act preempts that subsection. We note that our holding in this regard is limited to ORS 475.306(1); we do not hold that the Controlled Substances Act preempts provisions of the Oregon Medical Marijuana Act that exempt the possession, manufacture, or distribution of medical marijuana from state criminal liability. Fourth, because employee was currently engaged in the illegal use of drugs and employer discharged him for that reason, the protections of ORS 659A.112, including the obligation to engage in a meaningful interactive discussion, do not apply. ORS 659A.124. It follows that BOLI erred in ruling that employer violated ORS 659A.112.

The decision of the Court of Appeals and the revised order on reconsideration of the Commissioner of the Bureau of Labor and Industries are reversed.

**WALTERS, J.,** dissenting.

Neither the Oregon Medical Marijuana Act nor any provision thereof permits or requires the violation of the Controlled Substances Act or affects or precludes its enforcement. Therefore, neither the Oregon act nor any provision thereof stands as an obstacle to the federal act. Because the

majority wrongly holds otherwise, and because, in doing so, it wrongly limits this state's power to make its own laws, I respectfully dissent.

The United States Constitution establishes a system of dual sovereignty in which state and federal governments exercise concurrent authority over the people. *Printz v. United States*, 521 US 898, 920, 117 S Ct 2365, 138 L Ed 2d 914 (1997). Each government is supreme within its own sphere. *Id.* at 920-21. In enacting the federal Controlled Substances Act, which prohibits all use of marijuana, Congress acted pursuant to its authority under the Commerce Clause. *Gonzales v. Raich*, 545 US 1, 5, 125 S Ct 2195, 162 L Ed 2d 1 (2005). In enacting the Oregon Medical Marijuana Act, which permits the circumscribed use of medical marijuana, Oregon acted pursuant to its historic power to define state criminal law and to protect the health, safety, and welfare of its citizens. *Whalen v. Roe,* 429 US 589, 603, 603 n 30, 97 S Ct 869, 51 L Ed 2d 64 (1977); *Robinson v. California,* 370 US 660, 664, 82 S Ct 1417, 8 L Ed 2d 758 (1962).

In enacting the Controlled Substances Act, Congress did not have the power to require Oregon to adopt, as state criminal law, the policy choices represented in that federal act. Congress does not have the power to commandeer a state's legislative processes by compelling it to enact or enforce federal laws. *New York v. United States*, 505 US 144, 149, 112 S Ct 2408, 120 L Ed 2d 120 (1992). "[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *Id*. at 166.

Because it had authority to enact the Controlled Substances Act, Congress did, however, have the power to expressly preempt state laws that conflict with the Controlled Substances Act. A cornerstone of the Supreme Court's Supremacy Clause analysis is that "[i]n all preemption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied," the Court "start[s] with the assumption that the historic police powers of the States were not to be superseded

by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, ____ US ____ , ____ , 129 S Ct 1187, 1194-95, 173 L Ed 2d 51 (2009) (internal ellipsis and quotation marks omitted). The Court relies on that presumption out of "respect for the States as independent sovereigns in our federal system." *Id.* at 1195 n 3 (internal quotation marks omitted).

As the majority recognizes, the Controlled Substances Act does not include an express preemption provision. 348 Or at 173-75. It contains, instead, "a saving clause" intended to "preserve state law." *See Wyeth*, 129 S Ct at 1196 (so construing nearly identical provision in Federal Food, Drug, and Cosmetic Act). Thus, the majority should begin its analysis "with the assumption that the historic police powers [exercised by the State of Oregon] were not to be superseded by the Federal Act * * *." *Id.* at 1194-95.

The majority does not do so. It instead implies, from the federal policy choice that the Controlled Substances Act represents, a Congressional intent to preempt provisions of Oregon law that makes a different policy choice. 348 Or at 184. To understand the majority's error in applying the "obstacle" prong of the United States Supreme Court's implied preemption analysis, it is important to understand the purposes and effects of the federal and state laws that are at issue in this case.

Congress enacted the federal Controlled Substances Act, as the majority explains, to "conquer drug abuse" and "control" traffic in controlled substances. 348 Or at 172-73. In listing marijuana as a Schedule I drug, Congress decided that marijuana has no recognized medical use. Therefore, "Congress imposed a blanket federal prohibition" on the use of marijuana. 348 Or at 177-78. As noted, Congress did not expressly indicate, however, that states could not enact their own criminal drug laws or make different decisions about the appropriate use of marijuana.

Oregon did in fact enact its own criminal drug laws, including the state Uniform Controlled Substances Act (ORS

475.005 to 475.285 and ORS 475.840 to 475.980). That act controls and punishes, as state criminal law, the use of all substances that the federal government classifies as Schedule I drugs, including marijuana. ORS 475.840; ORS 475.856 - 475.864. Oregon also enacted the Oregon Medical Marijuana Act. That act exempts certain medical marijuana users from the *state* criminal drug laws, including from the *state* Uniform Controlled Substances Act. The Oregon Medical Marijuana Act does not permit Oregonians to violate the federal Controlled Substances Act or bar the federal government from continuing to enforce the federal Controlled Substances Act against Oregonians. The Oregon Attorney General described the purpose and reach of the Oregon Medical Marijuana Act in a letter ruling:

"The Act protects medical marijuana users who comply with its requirements from *state* criminal prosecution for production, possession, or delivery of a controlled substance. *See, e.g.*, ORS 475.306(2), 475.309(9) and 475.319. However, *the Act neither protects marijuana plants from seizure nor individuals from prosecution if the federal government chooses to take action* against patients or caregivers under the federal [Controlled Substances Act]. The Act is explicit in its scope: 'Except as provided in ORS 475.316 and 475.342, a person engaged in or assisting in the medical use of marijuana [in compliance with the terms of the Act] is excepted from the criminal laws *of the state* for possession, delivery or production of marijuana, aiding and abetting another in the possession, delivery or production of marijuana or any other criminal offense in which possession, delivery or production of marijuana is an element * * *.' ORS 475.309(1)."

Letter of Advice dated June 17, 2005, to Susan M. Allan, Public Health Director, Department of Human Services, 2 (first emphasis in original; later emphases added).[1] The Oregon Attorney General also concluded in that letter ruling

---

[1] Consistent with the Attorney General's letter opinion, ORS 475.300(4) provides that ORS 475.300 to 475.346—the entirety of the Oregon Medical Marijuana Act—is "intended to make only those changes to existing *Oregon laws* that are necessary to protect patients and their doctors from criminal and civil penalties[.]" (Emphasis added.)

that the decision of the Supreme Court in *Raich*—that Congress had authority to enact the blanket prohibitions in the Controlled Substances Act—had no effect on the validity of Oregon's statute:

> "*Raich* does *not* hold that state laws regulating medical marijuana are invalid nor does it require states to repeal existing medical marijuana laws. Additionally, the case does not oblige states to enforce federal laws. * * * The practical effect of *Raich* in Oregon is to affirm what we have understood to be the law since the adoption of the Act."[2]

*Id.* (emphasis in original).

The majority seems to accept that the Oregon Medical Marijuana Act does not bar the federal government from enforcing the Controlled Substances Act. The majority acknowledges that "state law does not prevent the federal government from enforcing its marijuana laws against medical marijuana users in Oregon if the federal government chooses to do so." 348 Or at 178. The majority also seems to accept, as a result, that provisions of the Oregon Medical

---

[2] The question that the Oregon Attorney General answered in the letter opinion was "Does *Gonzales v. Raich*, 545 US [1] (2005), * * * invalidate the Oregon statutes authorizing the operation of the Oregon Medical Marijuana Program?" The Attorney General said, "No." The Attorney General explained that "[t]he Act protects medical marijuana users who comply with its requirements from state criminal prosecution for production, possession, or delivery of a controlled substance," and cited ORS 475.309, ORS 475.319, and ORS 475.306(2). At the time of the Attorney General opinion, ORS 475.306(2) (2003) provided:

> "If the individuals described in subsection (1) of this section possess, deliver or produce marijuana in excess of the amounts *allowed* in subsection (1) of this section, such individuals are not excepted from the criminal laws of the state but may establish an affirmative defense to such charges, by a preponderance of the evidence that the greater amount is medically necessary to mitigate the symptoms or effects of the person's debilitating medical condition."

ORS 475.306(2) (2003), *amended by* Or Laws 2005, ch 822, § 2 (emphasis added). Thus, one of the subsections of the Oregon Medical Marijuana Act that the Attorney General cited used words of authorization very similar to those used in ORS 475.306(1).

Throughout the opinion, the Attorney General discussed the continued validity of the Oregon Medical Marijuana Act as a whole and did not in any way differentiate between provisions of the act that authorize medical marijuana use and those that create an exemption from state prosecution. In fact, the Attorney General specifically opined that the state is entitled to continue to issue registry identification cards—cards that, by definition, are documents that identify persons "*authorized* to engage in the medical use of marijuana." ORS 475.302(10) (emphasis added).

Marijuana Act that exempt persons from state criminal liability do not pose an obstacle to the Controlled Substances Act.[3] However, in the majority's view, one subsection of the Oregon Medical Marijuana Act, ORS 475.306(1), presents an obstacle to the Controlled Substances Act and does so solely because it includes words of authorization. *Id.* at 178.

As I will explain in more detail, I believe that the majority is incorrect in reaching that conclusion. First, the words of authorization used in ORS 475.306(1) and other subsections of the Oregon Medical Marijuana Act serve only to make operable the exceptions to and exemptions from state prosecution provided in the remainder of the act. The words of authorization used in those subsections do not grant authorization to act that is not already inherent in the exceptions or exemptions, nor do they permit the violation of federal law. Second, in instances in which state law imposes standards of conduct that are different than the standards of conduct imposed by federal law, but both laws can be enforced, the Supreme Court has not held the state laws to be obstacles to the federal laws, nor discerned an implied Congressional intent to preempt the state laws from the different policy choices made by the federal government. Thus, the majority is incorrect in finding that the standard of conduct and policy choice represented by the Controlled Substances Act prohibits a different state standard of conduct and policy choice. Both the Oregon Medical Marijuana Act and the Controlled Substances Act can be enforced, and this state court should not interpret the federal act to impliedly preempt the state act.

The Oregon Medical Marijuana Act contains a number of subsections that use words of authorization. Those subsections are interwoven with the subsections of the act that except and exempt medical marijuana users from criminal liability. For instance, ORS 475.309, which the majority cites as a provision that excepts persons who use medical marijuana from state criminal liability, 348 Or at 179-80, provides that a person engaged in or assisting in the medical use of marijuana "is *excepted* from the criminal laws of the state" *if*

---

[3] The majority expressly leaves that question open, however. 348 Or at 172 n 12.

certain conditions, including holding a *"registry identification card,"* are satisfied. (Emphases added.) ORS 475.302(10) defines "registry identification card" as follows:

> "a document issued by the department that identifies a person *authorized* to engage in the medical use of marijuana and the person's designated primary caregiver, if any."

(Emphasis added.)

Consider also ORS 475.306(1), the section of the act that the majority finds offending. That subsection references both ORS 475.309, the exception section, and the registry identification card necessary to that exception. ORS 475.306(1) provides:

> "A person who possesses a *registry identification card* issued *pursuant to ORS 475.309* may engage in, and a designated primary caregiver of such person may assist in, the medical use of marijuana only as justified to mitigate the symptoms or effects of the person's debilitating medical condition."[4]

(Emphasis added.) Reading those three provisions together, it is clear that ORS 475.306(1) serves as a *limitation* on the use of medical marijuana that the registry identification card and ORS 475.309 together permit. Under ORS 475.306(1), a person who possesses a registry identification card issued pursuant to ORS 475.309 may engage in the use the card permits *"only* as justified to mitigate the symptoms or effects of the person's debilitating medical condition." (Emphasis added.)

ORS 475.319, another section of the act that the majority cites as creating an exemption from criminal liability, also depends on words of permission for its operation. 348 Or at 179-80. ORS 475.319 creates an affirmative defense to a criminal charge of possession of marijuana, but only for persons who possess marijuana "in amounts *permitted* under ORS 475.320." (Emphasis added.) ORS 475.320(1)(a) provides: "A *registry identification cardholder* * * * *may possess*

---

[4] The majority recognizes that it is essential to read ORS 475.306(1) and ORS 475.302(10) together to find an affirmative authorization to use marijuana for medicinal purposes. 348 Or at 171. However, the majority does not explain why it finds ORS 475.306(1) and not ORS 475.302(10) preempted.

up to six mature marijuana plants and 24 ounces of usable marijuana." (Emphasis added.)

The words of authorization used in ORS 475.306(1) are no different from the words of authorization that are used in other sections of the act and that are necessary to effectuate ORS 475.309 and ORS 475.319 and the exceptions to and exemptions from criminal liability that they create. Those words of authorization do not grant permission that would not exist if those words were eliminated or replaced with words of exception or exclusion. Even if it did not use words of permission, the Oregon Medical Marijuana Act would permit, for purposes of Oregon law, the conduct that it does not punish. Furthermore, the statutory sections that provide that citizens may, for state law purposes, engage in the conduct that the state will not punish have no effect on the Controlled Substances Act that is greater than the effect of the sections that declare that the state will not punish that conduct.

Because neither the Oregon Medical Marijuana Act nor any subsection thereof gives permission to violate the Controlled Substances Act or affects its enforcement, the Oregon act does not pose an obstacle to the federal act necessitating a finding of implied preemption. In *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993), this court recognized that state and federal laws can prescribe different standards, each acting within its own authority, without affecting the other's authority, and without offending the Supremacy Clause. In that case, the defendant had been arrested by federal immigration agents on a warrant that the state conceded did not satisfy the oath or affirmation requirement of Article I, section 9, of the Oregon Constitution. The state argued, however, that, because the warrant was valid under federal law, "the Supremacy Clause render[ed] Article I, section 9, inapplicable to the arrest * * *." *Id.* at 34. The court rejected that argument and concluded that preemption was not at issue because the application of the state constitutional requirements for an arrest warrant did not "affect the ability of the federal government to administer or enforce its * * * laws." *Id.* at 36. Because the court interpreted the state constitution not to impose requirements on arrests by federal officers, the state and the federal law did not conflict:

"Because this court's interpretation of Article I, section 9, in this context, cannot and will not interfere with the federal government in immigration matters, the Supremacy Clause has no bearing on this case and this court is not 'preempted' from applying Article I, section 9, to defendant's arrest."

*Id*. Similarly, the Oregon Medical Marijuana Act "cannot and will not interfere with" the federal government's enforcement of the Controlled Substances Act and does not offend the Supremacy Clause.

Instead of following *Rodriguez*, the majority relies on two United States Supreme Court cases for the proposition that state law that permits what federal law prohibits is impliedly preempted. 348 Or at 177-78. The majority then concludes that, "[t]o the extent that ORS 475.306(1) affirmatively authorizes the use of medical marijuana, federal law preempts that subsection, leaving it 'without effect.' " 348 Or at 178. I disagree with the majority's analysis for two reasons. First, the cases that the majority cites stand only for the proposition that when federal law bestows an unlimited power or right, state law cannot preclude the exercise of that power or right. The Controlled Substances Act does not create a right; it prohibits certain conduct. Second, other Supreme Court cases hold that when a federal law does not create powers or rights but, instead, sets standards for conduct, state law may set different standards for the same conduct without offending the Supremacy Clause, as long as both sets of laws may be enforced. By deciding not to punish the medical use of marijuana, the Oregon Medical Marijuana Act authorizes, for state law purposes, conduct that the Controlled Substances Act prohibits. The Oregon Medical Marijuana Act does not, however, offend the Supremacy Clause because it does not affect enforcement of the Controlled Substances Act.

In the first of the two cases on which the majority relies, *Barnett Bank v. Nelson*, 517 US 25, 116 S Ct 1103, 134 L Ed 2d 237 (1996), a federal statute explicitly granted national banks the unlimited power to sell insurance in small towns. A state statute forbade and impaired the exercise of that power, and the court held that it was preempted.

*Michigan Canners & Freezers v. Agricultural Bd.*, 467 US 461, 104 S Ct 2518, 81 L Ed 2d 399 (1984), the second case on which the majority relies, concerned a conflict between the federal Agricultural Fair Practices Act, which protects the rights of producers of agricultural goods to remain independent and to bring their products to market on their own without being required to sell those products through an association, and a Michigan statute. *Id.* at 473. As the court explained in *Massachusetts Medical Soc. v. Dukakis*, 815 F2d 790, 796 (1st Cir), *cert den*, 484 US 896 (1987), the Agricultural Fair Practice Act creates a "right to refrain from joining an association of producers[.]" (Ellipses omitted.) The Michigan statute at issue prevented the exercise of the right conferred by the act by precluding an agricultural producer "from marketing his goods himself" and "impos[ed] on the producer the same incidents of association membership with which Congress was concerned * * *." *Michigan Canners*, 467 US at 478. The Court held that under those circumstances, the state statute was preempted.

Neither *Barnett* nor *Michigan Canners* stands for the proposition that a state statute that permits conduct that the federal government punishes is preempted. In those cases, the federal statutes did not punish conduct; they created powers or rights. The Court therefore struck down state statutes that forbade, impaired, or prevented exercise of those powers or rights. Because the Controlled Substances Act does not create a federal power or right and the Oregon Medical Marijuana Act does not forbid, impair, or prevent the exercise of a federal power or right, *Barnett* and *Michigan Canners* are inapposite. The more relevant Supreme Court cases are those that consider the circumstance that exists when federal and state laws impose different standards of conduct. Those cases stand for the proposition that states may impose standards of conduct different from those imposed by a federal law without creating an obstacle to the federal law.

In *California v. ARC America Corp.*, 490 US 93, 109 S Ct 1661, 104 L Ed 2d 86 (1989), the Court considered, under the "obstacle prong" of its "actual conflict" implied preemption analysis, the conflict between Section 4 of the federal

Clayton Act, which authorizes only direct purchasers to recover monopoly overcharges, and a state statute, which expressly permits recovery by indirect purchasers. The Supreme Court held that, even if the state statute directly conflicted with the goals of the federal law, as the Ninth Circuit had held, the state statute was not preempted. The Supreme Court reasoned that states are not required to pursue federal goals when enacting their own laws:

> "It is one thing to consider the congressional policies identified in *Illinois Brick* and *Hanover Shoe* in defining what sort of recovery federal antitrust law authorizes; it is something altogether different, and in our view inappropriate, to consider them as defining what federal law allows States to do under their own antitrust law."

*Id.* at 103.

Other Supreme Court cases also illustrate the Court's refusal to imply preemption, under the "obstacle" prong of its implied preemption analysis, where state and federal statutes set contrary standards or pursue contrary objectives. In *Silkwood v. Kerr-McGee Corp.*, 464 US 238, 246, 104 S Ct 615, 78 L Ed 2d 443 (1984), a case that the court in *ARC America* cited as authority, the jury had awarded the plaintiff a judgment of $10 million in punitive damages against the defendant, a nuclear power company. The defendant asserted that a conflict existed between the state law that permitted the judgment and a federal law regulating nuclear power plants, with which the defendant had complied. Despite an earlier ruling that the Nuclear Regulatory Commission had exclusive authority to regulate the safety of nuclear power plants,[5] and even though the Court accepted that "there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability," *id.* at 256, the Court refused to invalidate the state law.

In *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 US 132, 83 S Ct 1210, 10 L Ed 2d 248 (1963), a federal

---

[5] *Pacific Gas & Elec. v. Energy Resources Comm'n*, 461 US 190, 211-13, 103 S Ct 1713, 75 L Ed 2d 752 (1983).

statute authorized the marketing of Florida avocados on the basis of weight, size, and picking date; California, however, regulated the marketing of avocados sold in the state on the basis of oil content. As a result of the differing standards, about six percent of Florida avocados that were deemed mature under federal standards were rejected from California markets. The plaintiffs argued that the federal standard for regulating Florida avocados preempted California's conflicting regulation. As the dissent argued:

> "The conflict between federal and state law is unmistakable here. The Secretary asserts certain Florida avocados are mature. The state law rejects them as immature. And the conflict is over a matter of central importance to the federal scheme. The elaborate regulatory scheme of the marketing order is focused upon the problem of moving mature avocados into interstate commerce. The maturity regulations are not peripheral aspects of the federal scheme."

373 US at 173 (White, J., dissenting). The majority, however, concluded that the test of whether an actual conflict existed was not whether the laws adopted contrary standards, but whether both laws could be enforced:

> "The test of whether both federal and state regulations may operate, or the state regulation must give way, is *whether both regulations can be enforced* without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives."

*Id.* at 142 (emphasis added).

The Court's most recent case on the issue, *Wyeth v. Levine*, ____ US____ , 129 S Ct 1187, 174 L Ed 2d 51 (2009), is in accord. In that case, the court was presented with a conflict between state and federal law that the dissent characterized as follows: "The FDA told Wyeth that Phenergan's label renders its use 'safe.' But the State of Vermont, through its tort law said: 'Not so.' "[6] *Id.*, 129 S Ct at 1231 (Alito, J., dissenting). Nevertheless, the majority upheld the state law. Although

---

[6] The FDA had also adopted a regulation declaring that "certain state law actions, such as those involving failure-to-warn claims, 'threaten FDA's statutorily prescribed role as the expert Federal agency responsible for evaluating and regulating drugs.' " *Id.* at 1200.

the two laws imposed contradictory standards, the state law was not preempted.

The cases that I have reviewed demonstrate that the Supreme Court requires more as a basis for implying a congressional intent to preempt a state law than a Congressional purpose that is at odds with the policy that a state selects. The Court has permitted state laws that impose standards of conduct different than those set by federal laws to stand unless the state laws preclude the enforcement of the federal laws or have some other demonstrated effect on their operation. The Court has found state laws that forbid, impair, or prevent the exercise of federally granted powers or rights to be preempted.

The majority does not contend, in accordance with those cases, that ORS 475.306(1) or the Oregon Medical Marijuana Act as a whole precludes enforcement of the Controlled Substances Act or has any other demonstrated effect on its "accomplishment and execution." The only obstacles to the federal act that the majority identifies are Oregon's differing policy choice and the lack of respect that it signifies. 348 Or at 185.

As an example of the way it believes the Supremacy Clause to operate, the majority posits that, if Congress were to pass a law prohibiting persons under the age of 21 from driving, a state law authorizing persons over the age of 16 to drive and giving them a license to do so would be preempted.[7] 348 Or at 182. The majority would be correct *if* Congress had authority to make such a law and *if* Congress expressly preempted state laws allowing persons under the age of 21 to drive or indicated an intent to occupy the field. However, without such statement of Congressional intent, implied preemption does not necessarily follow. As a sovereign state, Oregon has authority to license its drivers and to choose its own age requirements. If Oregon set at 16 years the minimum age for its drivers, then the Oregon driver licenses it issued would give 16-year-olds only state permission to drive.

---

[7] As I read the majority opinion, a state law providing that Oregon would not punish drivers between the ages of 16 and 21, as opposed to permitting those persons to drive, *would* withstand a Supremacy Clause challenge.

The Oregon law would not be preempted, but neither would it protect 16-year-olds from federal prosecution and liability.

As a result, an Oregon legislature considering whether to enact such a law could decide, as a practical matter, that it would not be in the interest of its citizens to grant licenses that could result in federal prosecution. Suppose, however, that Congress had passed the federal law that the majority posits, but that federal officers were not enforcing it. Or suppose further that the federal government had announced a federal policy decision not to enforce the federal law against "individuals whose actions are in clear and unambiguous compliance with existing state laws" permitting minors to drive. Could Oregon not serve as a laboratory allowing minors to drive on its roads under carefully circumscribed conditions to permit them to acquire driving skills and giving Congress important information that might assist it in determining whether its policy should be changed? Is not one of federalism's chief virtues that "a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country"? *See New State Ice Co. v. Liebmann*, 285 US 262, 311, 52 S Ct 371, 76 L Ed 747 (1932) (Brandeis, J., dissenting) (so contending).

In the case of medical marijuana, the federal government in fact has announced that it will not enforce the Controlled Substances Act against "individuals whose actions are in clear and unambiguous compliance with existing state laws permitting the medical use of marijuana."[8] Oregon is not the only state that permits the use of medical marijuana, and at least one state is considering rules to "identify requirements for the licensure of producers and cannabis production facilities." New Mexico's "Lynn and Erin Compassionate Use Act," 2007 New Mexico Laws, ch 210, § 7 (SB 523).[9]

---

[8] Memorandum from David W. Ogden, Deputy Attorney General for Selected United States Attorneys on Investigations and Prosecutions in States *Authorizing the Medical Use of Marijuana* (Oct 19, 2009) (available at http://blogs.usdoj.gov/blog/archives/192) (accessed Apr 6, 2010) (emphasis in original).

[9] New Mexico's "Lynn and Erin Compassionate Use Act," 2007 New Mexico Laws, ch 210, § 7 (SB 523), requires relevant state agencies to develop rules that "identify requirements for the licensure of producers and cannabis production

As I explained at the outset, the federal government has no power to require that the Oregon legislature pass state laws to implement or give effect to federal policy choices. One sovereign may make a policy choice to prohibit and punish conduct; the other sovereign may make a different policy choice not to do so and instead to permit, for purposes of state law only, other circumscribed conduct. Absent express preemption, a particular policy choice by the federal government does not alone establish an implied intent to preempt contrary state law. A different choice by a state is just that—different. A state's contrary choice does not indicate a lack of respect; it indicates federalism at work.

The consequence of the majority's decision that the Controlled Substance Act invalidates ORS 475.306(1) is that petitioner is disqualified from the benefits of ORS 659A.124, which imposes a requirement of reasonable accommodation. The majority states that it does not decide "whether the legislature, if it chose to do so and worded Oregon's disability law differently, could require employers to reasonably accommodate otherwise qualified disabled employees who use medical marijuana to treat their disabilities." 348 Or at 172 n 12. Indeed, different words could be used for that purpose. For instance, the legislature could state expressly in ORS chapter 659A that disabled persons who would be entitled to the

---

facilities and set forth procedures to obtain licenses," as well as "develop a distribution system for medical cannabis" that comports with certain requirements. The New Jersey "Compassionate Use Medical Marijuana Act," S119, Approved PL 2009, c 307, § 7, provides for the creation of "alternate treatment centers, each of which

> "shall be authorized to acquire a reasonable initial and ongoing inventory, as determined by the department, of marijuana seeds or seedlings and paraphernalia, possess, cultivate, plant, grow, harvest, process, display, manufacture, deliver, transfer, transport, distribute, supply, sell, or dispense marijuana, or related supplies to qualifying patients or their primary caregivers who are registered with the department pursuant to section 4 of * * * this act."

The Maine Medical Marijuana Act provides for the creation of "nonprofit dispensaries" which are authorized to dispense up to two and one-half ounces of marijuana to qualified patients. Me Rev Stat title 22, § 2428-7. In Rhode Island, "The Edward O. Hawkins and Thomas C. Slater Medical Marijuana Act," provides for the creation of "compassion centers," which "may acquire, possess, cultivate, manufacture, deliver, transfer, transport, supply or dispense marijuana * * * to registered qualifying patients and their registered primary caregivers." RI Gen Laws § 21-28.6-12.

affirmative defense set forth in ORS 475.319 (a provision the majority does not find preempted) are not disqualified from the protections of the Oregon Disability Act, including the requirement of reasonable accommodation. Or, to be even more careful, the legislature could state, in chapter 659A, the conditions that a medical marijuana user must meet to be entitled to the protections of the Oregon Disability Act without any reference to the Oregon Medical Marijuana Act. If the legislature took either of those actions, reasonable accommodation would not be tied to the provision of the Oregon Medical Marijuana Act that the majority finds to be of "no effect."

Although such changes could secure the right of reasonable accommodation for disabled persons who use medical marijuana in compliance with Oregon law, the changes would not eliminate the questions that the majority's analysis raises about the validity of other provisions of the Oregon Medical Marijuana Act that use words of authorization or about the reach of Oregon's legislative authority. If the majority decision simply represents a formalistic view of the Supremacy Clause that permits Oregon to make its own choices about what conduct to punish (and thereby to permit) as long as it phrases its choices carefully, perhaps my concern is overstated. But as I cannot imagine that Congress would be concerned with the phrasing, rather than the effect, of state law, I not only think that the majority is wrong, I fear that it wrongly limits the legislative authority of this state. If it does, it not only limits the state's authority to make its own medical marijuana laws, it limits the state's authority to enact other laws that set standards of conduct different than the standards set by the federal government. Consider just one statute currently on the books—Oregon's Death with Dignity Act.

Oregon's Death with Dignity Act affirmatively authorizes physicians to use controlled substances to assist suicide.[10] In *Gonzales v. Oregon*, 546 US 243, 126 S Ct 904,

---

[10] ORS 127.815(1)(L)(A) authorizes physicians to dispense medications for the purpose of ending a patient's life in a humane and dignified manner when that patient has a terminal illness and has satisfied the written request requirements that the Act provides. ORS 127.905(1) authorizes a terminally ill patient to "make a written request for medication for the purpose of ending his or her life in a humane and dignified manner in accordance with [the Act]."

163 L Ed 2d 748 (2006), the Supreme Court considered the validity of a federal Interpretive Rule that provided that "using controlled substances to assist suicide is not a legitimate medical practice and that dispensing or prescribing them for this purpose is unlawful under the [Controlled Substances Act]." *Id.* at 249. The Supreme Court decided that the Interpretive Rule was invalid and did not decide whether the federal rule preempted the Oregon act. But if the federal government were to adopt a statute or a valid rule to the same effect, would this court hold that, because the Oregon Death with Dignity Act grants physicians permission to take actions that federal law prohibits, the state statute is preempted and of no effect? If so, the court would invalidate a state law using an analysis that at least three members of the Supreme Court have recognized to be faulty:

> "[T]he [Interpretive Rule] does not purport to pre-empt state law in any way, not even by conflict pre-emption— unless the Court is under the misimpression that some States *require* assisted suicide."

*Gonzales*, 546 US at 290 (Scalia, J., joined by Roberts, C. J. and Thomas, J., dissenting) (emphasis in original).

I do not understand why, in our system of dual sovereigns, Oregon must fly only in federal formation and not, as Oregon's motto provides, "with her own wings." ORS 186.040. Therefore, I cannot join in a decision by which we, as state court judges, enjoin the policies of our own state and preclude our legislature from making its own independent decisions about what conduct to criminalize. With respect, I dissent.

Durham, J., joins in this opinion.