# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DAVID PONCE and KARIM ZAPANA, individually and as Co-Personal Representatives of the Estate of JACOB PONCE, a deceased minor Child, | ) ) ) ) ) ) | NO. 72415-1-I |
| Appellants/Cross-Respondents, | ) ) | |
| v. | ) ) | DIVISION ONE |
| THE MOUNTAINEERS, a Washington Corporation, | ) ) ) | |
| Respondents/Cross-Appellants. | ) ) ) ) | UNPUBLISHED OPINION<br><br>FILED: November 2, 2015 |

LAU, J. — This case involves whether, under the evidence rules, the trial court properly admitted expert industry custom testimony. In this premises liability action, David Ponce and Karim Zapana, individually and as personal representatives of the Estate of Jacob Ponce, sued The Mountaineers after their son died in a sledding accident.[1] Before trial, Ponce moved in limine to preclude The Mountaineers' winter recreation expert from testifying about industry custom, arguing that he lacked sufficient foundation. The trial court denied Ponce's motion and the jury returned a verdict for The Mountaineers. We affirm the judgment on the verdict.

---

[1] We refer to appellants/cross-respondents collectively as "Ponce" in this opinion.

FACTS

In 2011, The Mountaineers owned and operated a recreational facility known as the Snoqualmie Campus located at Snoqualmie Pass, Washington. The Mountaineers offered the campus for a variety of outdoor activities, including public snow sledding during winter weekends.

Customers parked along Washington State Route 906 (SR 906) near an access trail. A Mountaineer greeted customers and instructed them to hike up the access trail to the top of the hill to reach the recreation area. The volunteer also explained that at the top, a volunteer would greet them and provide additional directions. The customers were then asked to sign a release and pay a fee before they could proceed.

To reach the sledding area via the access trail, the customer would hike straight up on packed, groomed snow with a 10 to 20 percent variable grade.

In February 2011, 7-year old Jacob Ponce and his family went to the Snoqualmie Campus to go sledding. After parking along SR 906, a volunteer at the base of the trail directed them to walk to the top of the hill to reach the sledding area. After hiking about 65 feet, Jacob abruptly sat down on the sled his older sister was pulling, causing her to release the sled. The sled traveled down the trail and out into SR 906. A passing vehicle hit the sled and Jacob died a short time later from his injuries.

In May 2012, Jacob's parents, David Ponce and Karim Zapana, filed suit individually and as co-representatives of Jacob's estate against The Mountaineers. The complaint alleged that The Mountaineers failed to exercise ordinary care by not maintaining a barrier at the base of its access path to prevent sledders from entering the roadway.

Before trial, Ponce moved in limine to exclude The Mountaineers' winter recreation expert Chris Stoddard from rendering the following opinions:

1. The Mountaineers' design and setup of its snow-covered pathway met alleged "industry standards" or was similar to that of other sledding operations;

2. Safety measures such as placing a snow berm at the bottom of the pathway would have been dangerous;

3. The warning signs on the pathway were adequate.

Clerk's Papers (CP) at 319. Stoddard was prepared to offer his opinions, among other opinions, on how The Mountaineers' Snoqualmie Campus operation and its access path compared to other winter recreation sledding and tubing areas.

The Mountaineers also moved in limine to exclude Ponce's human factors expert, Richard Gill, based on his lack of relevant knowledge on sledding and snow recreation area operations.[2] The trial court denied both motions in limine.[3]

At trial, each side presented a standard of care expert witness. Ponce offered Richard Gill, a human factors expert and a professor of engineering. Gill stated that The Mountaineers should have installed a barrier between the access path and SR 906. He proposed three barrier options: construction of a berm, placement of hay bales, or installation of a plastic fence. According to Gill, by failing to construct a barrier, The Mountaineers created a hazardous condition "functionally hidden to the typical patron." Report of Proceedings (RP) (May 20, 2014) at 68.

---

[2] The Mountaineers do not cross appeal denial of its motion to exclude Gill.
[3] On appeal, Ponce's challenge is limited to Stoddard's "industry standard" testimony.

The Mountaineers offered testimony from winter recreation expert Chris Stoddard. Stoddard stated that the access path was consistent with "industry best practices," and disagreed with Gill's opinion that the standard of care required The Mountaineers to install a barrier at the base of the path. CP at 456-57.

The jury returned a verdict finding The Mountaineers not negligent.

Ponce filed a motion for a new trial alleging the court erred by allowing Stoddard to testify regarding "industry standards." CP at 934. The trial court denied the motion.

Ponce appeals.

## ANALYSIS

Ponce contends that "the trial court abused its discretion by admitting highly prejudicial expert testimony regarding . . . industry standard without sufficient foundational evidence establishing that a relevant industry standard exists." Br. of Appellant at 20.[4] The Mountaineers offered Stoddard as its expert witness on the standard of care in the operation of a winter recreation facility.

### Standard of Review

Appellate courts review a trial court's decision on expert witness testimony for an abuse of discretion. Johnston-Forbes v. Matsunaga, 181 Wn.2d 346, 357, 333 P.3d 388 (2014). "If the basis for admission of the evidence is 'fairly debatable,' we will not disturb the trial court's ruling." Matsunaga, 181 Wn.2d at 352 (quoting Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue, 106 Wn.2d 391, 398, 722 P.2d 787 (1986)). A court abuses is discretion if its decision is manifestly unreasonable or based

---

[4] The parties refer variously to industry custom, industry standard, and industry practice. We use the term "industry custom" because that is the relevant legal standard where an expert testifies to the "way everyone does it." CP at 714 (court's order).

on untenable grounds or untenable reasons. Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668-69, 230 P.3d 538 (2010). The trial court has "broad discretion in ruling on evidentiary matters and will not be overturned absent manifest abuse of discretion." Cox v. Spangler, 141 Wn.2d 431, 439, 5 P.3d 1265 (2000). A court abuses its discretion if "it takes a view no reasonable person would take, or applies the wrong legal standard to an issue. . . ." Cox, 141 Wn.2d at 439. "[T]he trial judge has great discretion in ruling on the admissibility of expert testimony. Abuse of that discretion is much more likely to be found, however, with respect to the exclusion of expert testimony than when such testimony is admitted." ROBERT H. ARONSON & MAUREEN A. HOWARD, THE LAW OF EVIDENCE IN WASHINGTON § 8.03[4], at 8-15 (5th ed. 2014).

### Admissibility of Industry Custom

Washington law is generally in agreement with the *Restatement (Second) of Torts'* formulation of the rule governing admission of industry custom. Admission of industry custom according to the *Restatement (Second) of Torts § 295A (1965)* provides:

> In determining whether conduct is negligent, the customs of the community, or of others under like circumstances, are factors to be taken into account, but are not controlling where a reasonable man would not follow them.

The parties agree that evidence of more than one business is required to establish custom or practice. In Washington, "where negligence is in issue, the usual conduct or general custom of others under similar circumstances is relevant and admissible, [but] such custom may not be established by evidence of conduct of single persons or businesses." Swartley v. Seattle School Dist. No. 1, 70 Wn.2d 17, 21, 421 P.2d 1009 (1966); Miller v. Staton, 58 Wn.2d 879, 885, 365 P.2d 333 (1961).

Compliance with custom, although strong evidence of reasonable care, is not dispositive. See Meyers v. Meyers, 81 Wn.2d 533, 538-39, 503 P.2d 59 (1972); Peterson v. Pacific First Federal Sav. And Loan Ass'n, 23 Wn. App. 688, 693 n.3, 598 P.2d 407 (1979); *Restatement (Second) of Torts § 295A (1965)*.[5]

An authoritative Washington evidence treatise warns against the use of a fixed rule to determine admissibility of industry custom or standard in favor of a flexible case-by-case approach:

> In situations other than products liability actions, generalizations about the relevance of private, nongovernmental standards are hazardous. Each case must be judged on the basis of its own facts and the underlying substantive law. The evidence must, of course, be relevant to be admissible.
>
> . . . .
>
> To be admissible under this rule, industry standards or customs must be just that—standards or customs. The fact that one business or person (other than a party to the case) follows a certain practice may not rise to the level of a standard or custom, and may not be admissible under the instant rule.

5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 402.18, at 328 (5th ed. 2007).

---

[5] In Easterly v. Advance Stores Co., Inc., 432 F. Supp. 7, 9 (E.D. Tenn., 1976), the court quoted two prominent treatises on the subject: "'evidence of the usual and customary conduct of others under similar circumstances is normally relevant and admissible, as an indication of what the community regards as proper, and a composite judgment as to the risks of the situation and the precautions required to meet them.' [William L.] Prosser, [Handbook of the] Law of Torts (4th ed. 1971), 166, § 33. ' . . . This conduct of others, then (1) is receivable as some evidence of the nature of the thing in question, because it indicates what is the influence of the thing on the ordinary person in that situation; but (2) it is not to be taken as fixing a legal standard for the conduct required by law." II [John Henry] Wigmore, [A Treatise on the Anglo-American System of] Evidence [in Trials at Common Law] (3d ed. [1940]) 489, § 461."

Comment "a" of the *Restatement (Second) of Torts § 295A (1965)* states that customs and common practices "may be common to the community in general . . . or . . . limited to the common practices of a relatively small group of persons. . ."

In his sworn declaration and curriculum vitae filed in opposition to the motion in limine, Stoddard summarized his 39 years of extensive experience in winter recreation operations. He stated in relevant part:

2. I have dedicated the majority of my adult life to the field of risk management in ski areas and related winter recreation. This specifically includes areas designated for sledding and inner-tubing operations.

3. [S]now tubing and sledding are very similar activities and may occur at the same location. Based on my experience and 39-year career in winter recreation, it is appropriate to equate snow tubing and sledding operations for the purposes of my opinions given their close similarities.

4. I have worked in the ski and snowsports industry as a mountain operations staffer and manager; as an industry technical and educational program manager for the national Ski Areas Association; and as a consultant and author for decades. My work with ski and snowsports facilities is extensive and on-going. For many years, I inspected ski areas across the country for safety. . . . I've conducted 300-400 inspections at over 100 locations, the majority of which included areas specifically designated for snow-tubing or sledding. Many times, I was hired by the ski areas' insurance carrier. My reports were relied upon and used in setting rates and determining insurability. . . . I have never been retained for the exclusive purpose of slope design, this was commonly one of the several things that I consulted on (others included signage, staff training, and general risk management). I have . . . worked with facility operators to redesign tubing facilities to reduce the likelihood of collisions. I have also worked with facility operators to develop signage for their tubing facilities that included information and instructions, warnings, and directions.

5. I was asked in my deposition if I had visited other areas outside of Washington in connection with my work in this case. I responded that I had not, specifically in connection with this case, but that my visits to other places in conjunction with my professional work experience were related to my opinions in this case. . . I have performed many accident investigations and inspections of ski and snow tubing areas, including

hundreds of specialized survey inspections of ski and snow tubing facilities' operations. Accordingly, it was not necessary for me to make special trips to other areas for purposes of comparison because I am already able to make those comparisons based on my years of experience.

6. Through my 39 year career, working with so many ski areas, including their associated winter recreation activities of sledding and snow tubing. . . . I am very experienced and knowledgeable about industry standards and custom—and . . . "industry best practices." My expert knowledge in industry standards, customs, and best practices, as it relates to winter recreation including skiing, snowboarding, sledding and tubing, is the very reason that I continue to be retained by various clients in need of that expertise.

7. In addition to the experience and training that has been part of my professional experience through my consulting business, working for the National Ski Areas Association, and inspecting ski areas and the winter recreation activities associated with those areas, I am also an instructor of college courses in this field (as I have been for over 25 years). Ski area management includes management of other activities that are offered at ski areas in addition to just skiing or snowboarding, and those activities include sledding and snow tubing.

8. . . .[O]ne of the issues in this case is the steepness of the access trail slope where Jacob Ponce's sister let go of the sled she was pulling. I can say, based upon my years of professional experience, and having inspected many winter access trails over the years, that this trail was not particularly steep compared to others that I have visited in my career. It was actually moderate by comparison. Similarly, the fact that the road is accessible by adjoining trail is common in my experience. I know this from my professional experience of inspecting and visiting numerous different winter recreation operations in different locations throughout my professional career.

9. . . . I am an expert in human behavior and safety <u>as it pertains to winter recreation such as ski, sledding, and tubing areas</u> based on decades of relevant professional experience.

10. I am also an expert in signage as it relates to winter recreation. Other highly relevant professional experience . . . includes the fact that I am an active member of the American National Standards Institute's Committee on Passenger Ropeways (ANSI B77); the ANSI Committee that develops standards and signage for the operation of ski area chairlifts. Those standards, including signage standards, are adopted by law in most ski

area states, including Washington State. I currently chair the Operations and Signage Subcommittees, which means I am actively involved in developing signage and warnings that are adopted across the country, and are specifically adopted by statute and are the law in Washington State. I have also worked directly with various snow sports clients to assist them in developing signage and warning systems for use in ski and sledding/tubing areas. . . . Understanding appropriate signage needs, requirements, specifications and designs in a particular discipline does not require a degree in human factors. The Washington legislature has recognized the expertise of the ANSI B.77 signage committee that I chair by statutorily adopting those signs.

11. I have also published a booklet entitled "Introduction to Snowtubing Operations," which, to my knowledge, is the only one of its kind. . . [T]housands of these booklets have been sold to ski areas and snow tubing facilities—typically, to furnish to their new employees and/or volunteers. I have also developed a highly regarded snow sports program, "Be Aware—Ski With Care," which includes specific signage and logos that have been used across the country for decades.

12. . . . I testified in my deposition that I have never taught a class specifically about the design or layout of a ski or sledding area, there is no specific "design" class anywhere to my knowledge. . . . I have taught ski and tubing facility management courses for more than 25 years at colleges in Michigan, Colorado, and Montana. None of those courses were exclusively designated as "design" courses, however, slope design has been an element of many classes I have taught. One class, which I have been instructing for the last four years, involves very extensive work in the area of design/layout of tubing areas and risk management, which would also be applicable to sledding areas.

13. My work in this case has been extensive. . . . I researched other applicable standards, reviewed relevant documentation, and visited The Mountaineers' site personally. The research that I did and the documents that I rely on are the type of research and documents that would be reasonably relied on by an expert in the winter recreation field. My professional experience and background, combined with my site visit and research, was all information that I provided in my file during my deposition . . . including my membership on the ASTM F-27 Committee on Snow Skiing, where I have been a member since 1984 and an officer for 6 years, as well as my membership on the Wisconsin Passenger Tramway Advisory Board, where I was the trainer for state passenger tramway inspectors. I . . . investigated snow tubing and sledding accidents as a retained expert and have written reports regarding my professional

investigations. . . . I have testified about several of them as an expert in the context of litigation.

14. I testified in my deposition about the hazards associated with placing a berm or barricade at the bottom of The Mountaineers' access trail. These opinions are not based upon "speculation," they are based on my years of first hand professional knowledge and experience related to the use of berms or barricades in a winter recreation environment. Snow berms—a build-up of snow—are common at ski areas and snow tubing facilities. They can be created intentionally or simply be a by-product of snow being pushed into a pile (by a snow cat, for example). I am very aware of the injuries that can result from skiers, tubers, or sledders going over a berm at speed, and having the berm serve as a "launch" instead of stopping the person. I have personally investigated this type of problem and know from my years of experience working in the winter environment how easily this can happen. Doing "calculations" to determine whether or not any particular sled would go over a berm at any particular time would be difficult since the snow conditions play a huge part in how fast the sled would go, and the snow conditions can change very quickly with the weather. However, it is not necessary to do "calculations" to know that there is a very real risk that a sled on snow would slide up and over a berm, also made of snow, and cause the sled to fly into the air. I can also speak to the use of barricades since various types of barricades are used throughout the ski area/winter recreation industry for various purposes. I am professionally familiar with the effective use of barricades in winter recreation and their potential risk of injury. I have also researched that risk specifically, as it relates to sledding, in conjunction with my opinions in this case. This information was provided at my deposition.

CP at 455-61.

During his discovery deposition, Ponce's counsel asked Stoddard whether it was "economically and technologically feasible for The Mountaineers to eliminate the hazard posed by . . . State Highway 906 at the bottom of this access road?" CP at 304.

Stoddard responded:

If one believed that was a good idea, yes. But I don't think that that's the way it's done in most sidewalks that cross roads in the wintertime or driveways or any other facility where that's done. So, that isn't a normal practice at ski areas. That isn't a normal practice anywhere that I'm aware of. That would be a very

unusual thing to do and it would become an obstacle for those trying to use the facility, as we saw in some of the other photos.

CP at 304-05.

The trial court denied Ponce's in limine motion and allowed both experts to testify. In a written order, the court explained its rationale for allowing Stoddard's testimony.

> Mr. Stoddard is qualified to opine regarding the manner in which other mountain recreation areas handle situations that are similar to the one at issue in this case. His training and experience with other similar recreation areas allows him to speak to the dangerousness of suggested safety measures, the adequacy of warning signs, and the way in which other recreation areas have handled similar access paths. After significant consideration, the Court will also allow Mr. Stoddard to refer to "industry standards," in describing his understanding of what other recreation areas do in similar situations.
>
> As always, Plaintiff will have every opportunity during cross-examination to attack any loose language that Stoddard uses. They can delve into his definition of "industry standards," and in all other ways insure that the jury is not misled by any definitions or language he chooses.
>
> The Court notes that the two sides have chosen to use expert witnesses in this case in two very distinct ways. To simplify: Defendant has chosen to present an expert who is incredibly qualified to opine regarding, "the way everyone does it." Plaintiff, on the other hand, has chosen to present an expert who is incredibly qualified to opine regarding, "the way it should be done, regardless of how the industry handles it." The Court finds both approaches helpful to the jury here in determining what constitutes "ordinary care" in this premises liability case.

CP at 713-14.

### Expert Testimony at Trial

At trial, Stoddard described his investigation of The Mountaineers' access trail. He explained that his investigation also included on-site assessment of other Snoqualmie area access trails similar to The Mountaineers' access trail. In the course

-11-

of his investigation, Stoddard photographed the local area access trails he visited. He used the photographs at trial to aid his testimony on industry custom and practice.[6]

He described each photograph, which generally depicted recreation user access paths located close to or abutting a road or parking lot. For example, the photographs included a path along SR 906 that Stoddard described as groomed in a manner "very similar to what the same people did for The Mountaineers." RP (May 28, 2014) at 104. Another photograph depicted a trail leading to a parking lot marked with an orange cone. Stoddard displayed a photograph of a sledding area for children with an access path leading directly into a parking lot. He showed the jury a photograph of an access path to a cross-country skiing trail "similar to what The Mountaineers have done." RP (May 28, 2014) at 105.

Stoddard testified that the access path used by The Mountaineers was consistent with "industry best practices" and was consistent with others he had observed. He stated his opinions were based both on his investigation and general experience:

> [Defense Counsel]: And in all of that area you investigated, all the Snoqualmie Pass area and all the recreation areas that you observed in the region around Snoqualmie Pass, did you see any area where there was any kind of barricade separating the road or the parking lot or the car access from the winter recreation trails or winter recreation areas?
>
> [Stoddard]: No.
>
> [Defense Counsel]: And, more generally, not just specific to Snoqualmie Pass, but based on your 39 years of experience and your inspections, how common is it to have a steep, snow-covered slope, ski slope trail, that comes out directly onto a roadway?
>
> [Stoddard]: It's not at all uncommon. It's very—I can't say it's typical, but it's—it happens enough that it's out there a lot.

---

[6] These photographs were admitted for illustrative purposes only.

-12-

[Defense Counsel]: Okay. And would that be considered a normal and appropriate and even necessary part of winter recreation?

[Stoddard]: In those locations, yes.

[Defense Counsel]: And, again, would you describe an industry practice or best practice, I believe you referred to, regarding how to handle a snow-covered winter recreation trail that abuts a road or highway?

[Stoddard]: Well, the purpose of the trail is to let people go back and forth. And so it's got to be accessible. And it should also be unobstructed. So those are the key things that I would think of in terms of how to handle that trail. You want it to be accessible, people can come and go on it, and you don't want to have a whole lot of obstacles there.

[Defense Counsel]: And would it be an industry best practice, in your opinion, to have the type of access that was provided by The Mountaineers at the Snoqualmie Campus?

[Stoddard]: Yes. That's very typical of what I've seen all over the place.

RP (May 18, 2014) at 108-09 (emphasis added).

Stoddard further described the trail as within the steepness "industry norm" for access paths. RP (May 28, 2014) at 99. The Mountaineers asked Stoddard about an "industry standard." Stoddard explained that there is no "written document that everybody's agreed on in the industry as what the standard is." He said he was describing what he considered "best practices." RP (May 28, 2014) at 88. Stoddard also testified to topics covered in his declaration quoted above.

Gill testified to three primary opinions: (1) the overall design and operation of the access path created a hazardous condition hidden from the typical patron, (2) an underlying deficiency existed in The Mountaineers' safety program, and (3) the hazardous condition caused Jacob's death. Gill testified that the hazard in this case was hidden because "[w]alking up the pathway with your back to it [SR 906] pulling a

sled with your child on it doesn't appear to be a dangerous thing to do." RP (May 20, 2014) at 103. According to Gill, the act of pulling someone up the hill was the specific hazard presented: "But that's really what the hazard is, is pulling someone up the hill." RP (May 20, 2014) at 139.[7]

On cross-examination, Gill acknowledged that he examined no other sledding or tubing facilities in preparation for his testimony and performed no additional research on sledding or tubing operations. Although Gill compared the access path to a highway, a downhill ski slope, and other slopes related to ski racing and water slides, he did not compare the access trail here with other trails used for winter recreation for winter recreation. Gill acknowledged his opinions were based on his experience as a human factors expert.

Foundation[8]

Ponce specifically argues that Stoddard's industry custom testimony lacked sufficient foundation. He asserts, to establish admissibility, Stoddard was required "[to]

---

[7] At the conclusion of Gill's testimony, the jury asked additional questions. One juror asked "Have you ever attempted to pull a sled up a 20-degree grade hill with an inert 25 to 50-pound weight on it? Whether or not you have... would you agree that it would be easier to carry than pull a child up the hill?" RP (May 20, 2014) at 191. Gill stated that he had pulled his own daughters uphill on sleds before.

[8] The Mountaineers argue Ponce waived the right to challenge the court's in limine ruling on appeal by not objecting to the evidence at trial. We disagree.

Broadly speaking, to preserve an error for review the complaining party must timely object. RAP 2.5(a); DeHaven v. Gant, 42 Wn. App. 666, 669, 713 P.2d 149 (1986). Yet where a party obtains a definite ruling on a motion in limine, failure to object at trial does not constitute waiver because the party is deemed to have a standing objection. State v. Powell, 126 Wn.2d 244, 256, 893 P.2d 615 (1995). Here, the order constituted a definite, final ruling requiring no further objections. CP 714. The issue is properly raised in this appeal.

establish that at least two other sledding area operators did not construct a barrier at the base of an access path that funneled directly into a roadway."[9] Appellant's Reply at 4.

Generally, expert testimony is admissible if (1) the expert is qualified, (2) the expert relies on generally accepted theories in the scientific community, and (3) the testimony would be helpful to the trier of fact. Philippedes v. Bernard, 151 Wn.2d 376, 393, 88 P.3d 939 (2004). As noted above, trial courts are afforded wide discretion when applying this test. The trial court's expert opinion ruling will not be disturbed on appeal absent an abuse of discretion. In re Marriage of Katare, 175 Wn.2d 23, 38, 283 P.3d 546 (2012), cert. denied, 133 S. Ct. 889 (2013).

Four Washington evidence rules govern the admission of expert witnesses.[10] ER 702 generally controls on whether expert opinions are admissible at trial:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ER 703 permits an expert to rest his opinion on facts not admissible in evidence and to base his opinion on facts or data perceived by or made known to the expert at or before the hearing.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

---

[9] The Mountaineers failed "to identify at least two other sledding area operators that did not construct a barrier at the base of an access path that funneled directly into a roadway." Br. of Appellant at 26 (emphasis in original).

[10] Ponce acknowledges that his arguments do not challenge "Mr. Stoddard's qualifications or the reliability of his methodology." Reply Br. of Appellant at 21.

ER 704 permits an expert to testify to an ultimate issue the trier of fact must resolve:

Testimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

ER 705 states that an expert is not required to disclose the facts on which his opinion is based. But the court may require disclosure and cross-examination of the expert.

These evidence rules "reflect the widely held view that a reasoned evaluation of the facts is often impossible without the proper application of scientific, technical, or specialized knowledge. As a result, trial courts are given broad discretion to determine the circumstances under which expert testimony will be allowed." Matsunaga, 181 Wn.2d at 354.

Our review of the record shows the trial court considered the parties' briefs and materials supporting and opposing Stoddard's industry custom testimony. During oral argument, the trial court carefully questioned both counsel about the basis for and scope of Stoddard's expert opinions.[11]

The Mountaineers made a further offer of proof in response to Ponce's concern that,

"[Stoddard's] opinion is a generalization of, in my experience, all the years, you know, having gone up to different mountains, different places and looked at, you know, sledding areas, skiing areas, this is what is done. And there's no way for us to cross him on that is, because he couldn't identify a specific area that he was referring to. And so an expert can't just come forward and say, well, it's my, you know, based on my knowledge from having looked at hundreds of these places, they all do it this way. Because that's not true."

---

[11] The oral argument transcript consists of 15 pages.

-16-

RP (May 15, 2014) at 106.

In response, The Mountaineers made a further offer of proof as to the foundation for Stoddard's opinions:

> So Mr. Stoddard will testify that he's got 39 years of experience, which includes 3—to 400 inspections of a hundred different areas, ski areas, and that more than half of them had winter recreation, sledding, and tubing. And I include tubing because it's going downhill on a sliding device. And that his opinions are based on those inspections, the classes that he teaches that are related to outdoor winter management, specific manuals that he has written regarding tubing, his expertise on signage, which he equates with winter recreation.
>
> . . . .
>
> [H]is opinions on an industry standard are based at looking at over a hundred facilities, more than half of them having downhill sliding facilities. . . . [Gill's] critical of the fact that there's access to the road.
>
> Mr. Stoddard will say that, based on his investigations, that that is actually quite common. . . . [H]e will speak to how berms are used based on personal experience, which includes investigating accidents where people have come down on a tube or a sled and been launched off of a berm and been seriously injured. He has actual investigative personal knowledge of the fact that a berm on its own can create a hazard. He's investigated those accidents, and that's the basis for his testimony.
>
> And he's aware of where berms are used, how they're used. It's part of what he teaches in his training regarding the tubing areas and signage. . . .
>
> . . . .
>
> I think the jury gets to decide what ordinary care is. And what Mr. Stoddard is going to testify to is, this is what is considered best practices by people that run a similar outdoor recreation facility. This is how they manage the risk. The way The Mountaineers managed the risk is the same or similar—doesn't have to be identical, just has to be the same or similar. And then that's up to the jury whether or not that meets the standard of ordinary care.
>
> . . . .
>
> I'm giving you from his testimony the fact that he's referring to 3—to 400 inspections with a hundred different facilities and over half of those having sledding or tubing. Did anybody specifically list how many of those are near roads? Nobody asked that question. What he said is, "It's not unusual; it's actually quite common."

RP (May 15, 2014) at 112-17.

Responding to Ponce's claim below that the generalized opinion deprived him of effective cross-examination, The Mountaineers pointed out that no one asked Stoddard during his discovery deposition (or at trial) to identify by name any of the locations he inspected or to name which ones were near roads. On appeal, Ponce argues that, "Mr. Stoddard did not—and could not—identify at his deposition any other sledding operation where the access paths funneled directly into a roadway." Br. of Appellant at 17 (emphasis added). He cites to the deposition transcript at 290-313 for this assertion. He also argues that this deficiency caused him to file a motion in limine. Even reading the deposition excerpts liberally, they show Stoddard was never asked to name, list or identify a specific area. Thus, there is no support for Ponce's claim that Stoddard "could not" identify the areas he testified about in his deposition.

Indeed, at least one other court has affirmed the use of generalized industry custom expert testimony. In LaVallee v. Vermont Motor Inns, Inc., 153 Vt. 80, 569 A.2d 1073 (1989), a motel guest sued the motor inn after he fell and injured himself in his motel room during a power outage. The guest alleged the inn negligently failed to provide adequate emergency lighting. The guest presented evidence that the inn had notice of power failures in previous years, that it provided flashlights at the front desk for emergencies, that emergency lighting was available in the motel hallways, and that inexpensive battery powered lighting fixtures were available and could have been installed in the motel rooms. The trial court concluded that this evidence, even if true, was insufficient as a matter of law to show that the inn owner had failed to exercise ordinary care.

On appeal, the Vermont Supreme Court held that the trial court appropriately considered evidence of the motel industry's practice and custom, citing *Restatement (Second) of Torts § 295A (1965)*, noting that no witness knew of any motel or hotel that provided the sort of emergency lighting that the guest claims the inn had a duty to provide. Similar to the present case, the inn's general manager testified, "In my ten years [in the industry] and all my travels, I've never seen emergency lighting in a motel room." LaVallee, 153 Vt. at 85.

The Supreme Court explained its rationale:

> While industry custom is not conclusive as to what is reasonably prudent conduct in any given case, it is a useful guide, unless it is apparent that under the particular circumstances of the case a reasonable person would not conform to the industry-wide custom. See McCormack v. Noble Drilling Corp., 608 F.2d 169, 174 n.8 (5th Cir. 1979).

LaVallee, 153 Vt. at 85.

As to The Mountaineers' argument that Ponce could have elicited the testimony on cross-examination, Ponce asserts this constitutes impermissible burden shifting. We disagree. It is true that the proponent of expert testimony carries the burden to establish foundation for the expert's opinions. The record here establishes that burden was met in this case.

The trial court issued a brief but thoughtful written ruling denying the industry custom in limine motion and explaining its rationale quoted above. As discussed above, expert testimony is admissible if the expert is qualified and relies on generally, accepted theories and the testimony would be helpful to the trier of fact.

The trial court found Stoddard "incredibly well qualified to opine regarding, 'the way everyone does it.'" The record before the trial court amply supports this conclusion.

The Mountaineers' written submissions show Stoddard's qualifications to offer expert testimony based on his education, training, knowledge, and experience in the field of winter recreation operations. Here, Stoddard testified based on his 39 years of experience and hundreds of inspections that it was not at all uncommon to have a steep, snow-covered slope or trail funnel directly onto a roadway. His opinions were also based on his investigation at more than 50 snow tubing, snow play and ski areas including the local Snoqualmie snow recreation areas. He also stated such a trail is the norm, appropriate and even a necessary part of winter recreation. He also explained the dangers posed by a berm, fence, or hay bale. He concluded the trail access at issue here conformed with "industry best practices." The record also supports the trial court's conclusion that the approaches by both experts are helpful to the jury in determining "what constitutes ordinary care in this premises liability case." CP at 714.

Ponce also argues that "there was no foundational evidence that Mr. Stoddard had experience with 'similar recreational areas' or 'the way in which other recreation areas have handled similar access paths.'" Br. of Appellant at 25. The record undermines this point. For example, noted above, the record shows Stoddard's industry custom testimony and practice opinion was based, in part, on his inspection and investigation of numerous winter recreation area access paths that abut roadways or parking areas. Jury instruction 6 states:

> Negligence is the failure to exercise ordinary care. It is the doing of some act that a reasonably careful person would not do under the same or similar circumstances or the failure to do some act that a reasonably careful person would have done under the same or similar circumstances.

CP at 899.

Under the facts presented here, the trial court properly determined that Stoddard "is qualified to opine" about how "other mountain recreation areas handle situations that are similar to the one at issue in this case. . ." and "what other recreation areas do in similar situations." CP at 713.

Ponce relies on cases that are not helpful. For example, Ponce cites Queen City Farms, Inc. v. Central Nat'l. Ins. Of Omaha, 126 Wn.2d 50, 882 P.2d 703 (1994). In that case, the plaintiff sued a defendant insurer. At trial, the defense expert testified about various insurers' underwriting practices for waste disposal sites. But the expert admitted he had no experience with the insurance in question, had never underwritten insurance covering a waste disposal site, and had no personal knowledge of any of the other syndicates' underwriting practices. Queen City Farms, 126 Wn.2d at 103. That case merely stands for the unremarkable proposition that an expert may not render a speculative opinion departing from his or her established expertise.

Ponce also relies on State v. J-R Distributors, Inc., 82 Wn.2d 584, 512 P.2d 1049 (1973), and Puget Sound Elec. Ry. v. Carstens Packing Co., 76 Wn. 364, 136 P. 117 (1913). J-R Distributors involved expert testimony on a "contemporary community standard of acceptance" for an obscene video. And in Carstens Packing Co., a railroad sued a defendant packing company after its railway cars were damaged in a wreck. The trial court refused to allow the defendant to present evidence that another railroad company loaded the railroad cars in a similar manner.

Ponce cites Young v. Key Pharmaceuticals, Inc., 130 Wn.2d 160, 922 P.2d 59 (1996). There, the plaintiff sued Key Pharmaceuticals for injuries caused by an asthma medication. At trial, counsel offered a photocopy of an advertisement for a similar

medication that included a warning. Key Pharmaceuticals objected on grounds of lack of foundation. Young did not involve a question of industry custom. The court excluded the exhibit because the plaintiff was unable to establish the advertisement's source or the defendant's awareness of the information it contained.

Trial judges perform an important gate keeping function when determining the admissibility of evidence. Courts must interpret evidence rules mindful of their purpose: "that the truth may be ascertained and proceedings justly determined." ER 102. Here the trial court properly exercised its gatekeeping role when it allowed the challenged evidence of industry custom. It was then the jury's function to weigh the competing expert opinions to determine the reasonableness of The Mountaineers' conduct under the circumstances. It is well settled that evidence of custom or practice is not

> necessarily conclusive as to whether the actor, by conforming to it, has exercised the care of a reasonable [person] under the circumstances, or by departing from it has failed to exercise such care . . . . It follows, therefore, that whenever the particular circumstances, the risk, or other elements in the case are such that a reasonable [person] would not conform to the custom, the actor may be found negligent in conforming to it; and whenever a reasonable man would depart from the custom, the actor may be found not to be negligent in so departing.

RESTATEMENT (SECOND) OF TORTS, § 295A cmt. C.

We conclude that the trial court acted well within its broad discretion when it allowed Stoddard to testify about industry custom and practice.

Negligence as a Matter of Law

For the first time on appeal, Ponce relies on Helling v. Carey, 83 Wn.2d 514, 519 P.2d 981 (1974), arguing we should declare The Mountaineers negligent as a matter of law and remand solely on the issue of damages. We decline to address this argument. RAP 2.5. Even if we considered Helling, it is materially distinct from the present case.

In Helling, plaintiff sued her ophthalmologist, claiming permanent visual damage due to defendants' failure to diagnose and treat her condition. The Supreme Court concluded that defendants were negligent as a matter of law for failing to administer a simple glaucoma test "despite uncontradicted expert testimony that it was the universal practice of ophthalmologists not to administer glaucoma tests to patients under age 40." Helling, 83 Wn.2d at 514. The court held that the reasonable standard requires "the timely giving of this simple, harmless pressure test." Helling, 83 Wn.2d at 519. Helling is distinguishable.

Unlike in Helling, the remedy proposed by Ponce is not harmless—hay bales, fencing or snow berms carry the potential risks of serious injury or death. Thus Helling is not persuasive.

CONCLUSION[12]

For the reasons discussed above, we affirm the judgment on the jury's verdict.

WE CONCUR:

---

[12] Given our resolution in this case, we need not address The Mountaineers' cross appeal.